[Sac. No. 1802. In Bank.—June 1, 1911.]

JULIA L. PETERS, Administratrix of the Estate of Herman L. Peters, Deceased, Respondent, v. SOUTHERN PACIFIC COMPANY, Appellant.

NONSUIT—ORDER DENYING—OMITTED EVIDENCE SUBSEQUENTLY INTRODUCED.—An order denying a motion for a nonsuit will not be disturbed, although the evidence at the close of plaintiff's case was so weak that it might properly have been granted, if, upon the trial, the defect is overcome by evidence subsequently introduced.

NEGLIGENCE—RAILROAD—FELLOW-SERVANTS—BRAKEMAN AND CONDUCTOR ON DIFFERENT TRAINS—OPEN SWITCH—SELECTION OF BRAKEMAN—WANT OF ORDINARY CARE.—Under section 1970 of the Civil Code, as the same stood on December 31, 1904, a brakeman on a construction train and an engineer on a passenger train of a railroad, were fellow-servants, employed in the same general business of operating the railroad, and if the death of the latter was the result of simple negligence on the part of the former in leaving a main switch open, being otherwise entirely competent to discharge the duties of a brakeman with reference to switching, no recovery therefor could be had against the railroad. The railroad could only be held liable if it had neglected to use ordinary care in the selection of the brakeman.

ID.—ORDINARY CARE, HOW DETERMINED—PERILS OF EMPLOYMENT.—While railroad companies are only bound to the exercise of ordinary care in the selection of their employees, this ordinary care to be exercised is to be measured by the perils to be encountered in the discharge of the duties of the employment and the consequences which might reasonably be expected to follow where an incompetent or unskillful employee is engaged.

ID.—CARE IN SELECTION FOR DANGEROUS EMPLOYMENT—INVESTIGATION OF EMPLOYEE'S QUALIFICATIONS—REASONABLENESS OF INVESTIGATION.—Where the service in which the servant is employed is such as to endanger the lives and persons of co-employees if the servant is not competent, an employer is bound in the exercise of ordinary care, to make a reasonable investigation into his character, skill, qualifications, and habits of life. The question whether he has made such investigation as is reasonable under all the circumstances is for the jury.

ID.—EVIDENCE—NEGLIGENCE OF BRAKEMAN IN LEAVING SWITCH OPEN.— After a review of the evidence it is held, that in view of the facts that the switch connecting the main track with the siding was undoubtedly open when the passenger train approached, that the brakeman of the construction train was the only person who operated it, that he had opened it and was doubtful as to whether he had closed it or not, the jury were warranted in finding that he had not closed it, and that the accident was due to negligence on his part in that respect.

ID.—SINGLE ACT OF NEGLIGENCE—EMPLOYEE RECENTLY EMPLOYED.—The rule that where an employee has been for years engaged in the performance of duties, and has theretofore performed them properly, a single act of negligence on his part may be attributable to remissness in discharging known duties, rather than to ignorance and incompetency respecting their proper performance, is inapplicable to an employee who had only recently gone into the employment.

ID.—COLLISION BETWEEN TRAINS—IGNORANCE OF EMPLOYEE OF RULES AFFECTING SWITCHING FOR PASSING TRAINS.—Where the injury to the engineer of the passenger train was the result of a collision between his train and a construction train standing on a siding, and was caused by the negligence of the brakeman of the construction train in leaving open a switch connecting the siding with the main track on which the passenger train was approaching, a finding of the jury that the brakeman was incompetent to properly discharge his duties as such at the time of the accident is warranted by evidence showing that he was then ignorant of a rule of the railroad relative to his duties in main-line switching, which required him, under such circumstances, after attending to the switch, to lock it to the main track, and take a position on the opposite side of the track from the switch and remain there until the expected train had passed.

ID.—IGNORANCE OF RULES RENDERS EMPLOYEE INCOMPETENT.—An employee of a railroad company who is ignorant of important rules governing the discharge of hazardous duties assigned to him is an incompetent employee.

ID.—REASONABLE CARE IN INSTRUCTING EMPLOYEE—QUESTION FOR JURY —EVIDENCE.—Whether an employer has taken reasonable precautions to instruct a prospective employee in the proper discharge of the duties of a position he desires to fill, or whether reasonable investiga-

CLX Cal.—4

tion into his qualifications has been preliminarily made before assigning him to duty, are peculiarly matters to be determined by the jury from all the circumstances disclosed by the evidence. A finding of the jury that the railroad was remiss in these particulars is held to be supported by the evidence.

ID.—EXPERIENCE FITTING EMPLOYEE TO BE BRAKEMAN—EXPERT EVIDENCE.—In an action to recover for such an injury, the testimony of old and experienced railroad brakemen and switchmen as to what experience was required to fit a person as brakeman and switchman, is admissible. The matter is one of proper expert testimony.

ID.—PLACE OF SWITCHING—EVIDENCE OF UNUSUAL DIFFICULTY.—In determining the competency of the brakeman to perform the duties assigned him of switching at a particular place, evidence was admissible that such place was a particularly difficult place in which to switch.

ID.—ACTION BY WIDOW AND CHILDREN FOR DEATH—EVIDENCE OF WAGES OF DECEASED EMPLOYEE—PLEADING—GENERAL ALLEGATION OF DAMAGE.—In an action to recover for the damages sustained by the widow and minor children of such engineer by reason of his negligent killing, evidence is admissible, under the general allegation of damages, to prove the average rate of wages which the deceased was receiving at the time of his death. It was not necessary to specially aver the particular loss sustained to his wife and minor children by being deprived of the benefit of his future wages through his death. Such loss is one of the elements of damage which go to make up the whole damage proximately caused by his death, for which recovery may be had under section 3333 of the Civil Code.

ID.—PECUNIARY INTEREST OF CHILDREN IN LOSS OF FATHER—BENEFITS ACCRUING AFTER MAJORITY.—The pecuniary interest of the children in the loss of their parents does not necessarily end with their arrival at the age of majority, but the jury, in such action, may allow for the probable loss of any benefit, if any, of a pecuniary value, which the child would probably receive from the parent after arrival at majority.

ID.—INSTRUCTIONS—PECUNIARY LOSS ONLY CAN BE AWARDED.—Where the jury are so instructed, a further instruction that "such damages are not limited to the actual pecuniary damage sustained by the plaintiff by reason of the loss of services of deceased," will not be deemed erroneous, where the instructions taken as a whole clearly informed the jury that damages for pecuniary loss could alone be awarded, and that nothing could be awarded for grief, mental suffering, or sorrow.

ID.—MEASURE OF DAMAGES—ELEMENTS OF PECUNIARY LOSS.—In such action the plaintiff is entitled to recover for all pecuniary loss sustained, and as elements in determining that pecuniary loss the jury are to take into considertation the loss which the wife and children have sustained through being deprived of the comfort,

society, support, and protection of the deceased by the wrongful act of the defendant.

ID.—INSTRUCTIONS TO BE CONSTRUED AS ENTIRETY.—In considering whether the jury has been properly instructed in a given case, it is not the proper test to take into consideration excerpts from a particular instruction, or a single instruction given in the case. All of the instructions given must be considered, and if, taken as a whole, they lay down a correct rule for the ascertainment of damages, that is all that is required.

APPEAL from an order of the Superior Court of Solano County refusing a new trial. L. G. Harrier, Judge presiding at trial. A. J. Buckles, Judge presiding on motion for new trial.

The facts are stated in the opinion of the court.

Frank McGowan, McGowan, Squires & Westlake, William F. Herrin, and P. F. Dunne, for Appellant.

William J. Herrin, and C. H. Garoutte, for Respondent.

LORIGAN, J.—Plaintiff, the surviving widow of Herman L. Peters, deceased, brought this action under the statute, as administratrix of his estate, to recover damages sustained by her and the two minor children of deceased through the death of the latter, alleged to have been occasioned through the negligence of defendant.

Herman L. Peters was the engineer on a passenger train of defendant known as the Oregon Express which, on its route, passed through the town of Suisun in Solano County. On December 31, 1904, this train being late, and having the right of way in passing through said town, ran into an open switch on the main line of defendant, colliding with a construction train on a side track, with the result that the engine and a portion of the passenger train were demolished and said engineer Peters instantly killed.

The complaint alleged that the accident resulting in the death of Peters was occasioned through the main line switch being left open by one Leo. J. Sheridan, head brakeman on the construction train with which the passenger train collided, and as a basis of her right to recover, it was alleged that at the time of the accident the said Sheridan was inexperienced as a

brakeman, unfamiliar with switching and incompetent to discharge the duties thereof assigned him; that before employing said Sheridan the defendant did not exercise ordinary care in instructing him how to perform the work of brakeman and switchman, and did not use ordinary care and prudence in selecting him to perform that work to which he was assigned.

The jury returned a general verdict in favor of plaintiff, for thirty thousand dollars.

Interrogatories, in the nature of a special verdict, were propounded to the jury, and in answer thereto they found that Sheridan left the main switch open after the construction train had backed into the side track; that when employed by defendant Sheridan was a man of ordinary intelligence, but that he had not received the usual course of instruction by defendant as to his duties as brakeman before being employed by it as such; that he was not then a competent or experienced switchman or brakeman; that he had not sufficient training and experience to properly perform the duties of head brakeman in a place like Suisun; that he was not sufficiently conversant with the rules of the defendant to properly perform the duties of head brakeman at that place, and that defendant had not exercised ordinary care and prudence at the time it employed Sheridan to perform the duties of brakeman.

Judgment having been entered in favor of plaintiff upon the verdict, defendant moved for a new trial, which being denied, it takes this appeal from the denial of that order alone.

As grounds for reversal it is insisted that the court erred in denying the motion of defendant for a nonsuit, and that, aside from this, the evidence on the whole case is insufficient to sustain the verdict. It is further claimed that the court erred in its rulings on the admission of evidence and in its instructions to the jury, and that the damages awarded were excessive.

We shall not examine into the correctness of the ruling of the court in denying the motion for a nonsuit. After the order made, the defendant introduced evidence on its defense. It is well settled that an order denying a motion for a nonsuit will not be disturbed, although the evidence at the close of plaintiff's case was so weak that it might properly have been granted, if, upon the trial, the defect is overcome by evidence subsequently introduced. If, upon the conclusion of the whole

case, there is evidence upon the material issues warranting the submission of the cause to the jury, the question of whether the court erred in denying a nonsuit becomes of no consequence. (*Lowe* v. *San Francisco Ry. Co.*, 154 Cal. 573-576, [98 Pac. 678], and cases therein cited.)

In fact, while the point is made here that the court erred in the ruling on the nonsuit, it is not particularly pressed, because the broader position is taken that the evidence, even treated as a whole, does not sustain the verdict in several essential respects.

The rule of law under which it was claimed that the defendant was liable for the death of Peters is found in section 1970 of our Civil Code, as it stood when the accident occurred, and which declared that "An employer is not bound to indemnify his employee for losses suffered by the latter in consequence of the ordinary risks of the business in which he is employed, nor in consequence of the negligence of another person employed by the same employer in the same general business, unless the negligence causing the injury was committed in the performance of a duty the employer owes by law to the employee, or unless the employer has neglected to use ordinary care in the selection of the culpable employee."

It must, of course, be conceded that Sheridan and the deceased were fellow-servants, employed in the same general business of defendant in operating its railroad, and that if the death of deceased was the result of simple negligence on the part of Sheridan in leaving the main switch open, being otherwise entirely competent to discharge the duties of a brakeman with reference to switching, no recovery could be had against the defendant. This being true, necessarily the plaintiff, in order to recover, was required to make out a case bringing it within the provision of the statute just quoted from, making defendant liable where "the employer has neglected to use ordinary care in the selection of the culpable employee" by whose act, in the discharge of the duties assigned him, the death of plaintiff's intestate resulted.

It is so well settled as to need no particular discussion nor citation of authority, that while railroad companies are only bound to the exercise of ordinary care in the selection of their employees, this ordinary care to be exercised is to be measured by the perils to be encountered in the discharge of

the duties of the employment and the consequences which might reasonably be expected to follow where an incompetent or unskillful employee is engaged.

The general rule in this respect is clearly stated in *Still* v. *San Francisco etc. Ry. Co.*, 154 Cal. 559, 567, [129 Am. St. Rep. 177, 20 L. R. A. (N. S.) 322, 98 Pac. 672], which involved, as here, the question as to the ordinary care to be exercised by a railroad in the selection of its employees. It is there said: "Under all the authorities, the term 'ordinary care' as used in this connection means that degree of care that a man of ordinary prudence would use in view of the nature of the employment and the consequences of the employment of an incompetent person—a degree of care commensurate with the nature and danger of the business and the grade of service for which the servant is intended, and the hazards to which other servants are to be exposed from the employment of a careless or incompetent person. (Wood on Law of Master and Servant, secs. 417, 418.) In accord with this rule, it is generally declared that where the service in which the servant is employed is such as to endanger the lives and persons of co-employees if the servant is not competent, an employer is bound in the exercise of ordinary care, upon the plainest principles of justice and good faith, to make a reasonable investigation into his character, skill, qualifications, and habits of life. (See 1 Labatt on Master and Servant, sec. 194; Bailey's Personal Injuries, sec. 1407; *Western Stone Co.* v. *Whalen*, 151 Ill. 472, 42 Am. St. Rep. 244, 38 N. E. 241; *Mann* v. *Delaware etc. Co.*, 91 N. Y. 495.) The question whether he has made such investigation as is reasonable under all the circumstances is peculiarly one for the jury."

Under the allegations of her complaint, and to bring her right to recover within the rule of liability announced, the plaintiff undertook to prove that Sheridan, when employed by defendant, was in fact incompetent to act as a brakeman; that the accident causing the death of Peters was proximately caused by such incompetency; and that defendant before assigning him to the discharge of the duties of brakeman and switchman, had failed to use proper diligence or care in instructing him as to his duties in such position, or to exercise ordinary care and diligence to ascertain his qualifications to discharge the duties of that position before assigning him to

it. The jury found by its special and general verdict in favor of the claim of plaintiff in all these respects, and in every particular the claim of appellant is that such findings of fact are not supported by the evidence. On the contrary, appellant claims that the evidence affirmatively shows that the main line switch was not left open by Sheridan, and was not, in fact, open at the time the Oregon Express passed through it; that the evidence shows Sheridan to have been a competent and experienced brakeman; that the defendant took all reasonable care and precaution not only to instruct Sheridan as to his duties as brakeman and switchman, but before accepting him as an employee had made special examination into his qualifications as such, with satisfactory results.

The claims of appellant being thus stated, brings us to an examination of the evidence.

Sheridan, who was twenty years of age at the time of the accident, and known among his fellow employees as "Kid Sheridan," had never had any experience in railroading when he made application to the defendant as a student brakeman, which, as the term imports, was to learn the duties of the position which he desired to assume with the company. This application was made October 3, 1904, and he went into the employ of the defendant as such a student on November 21, 1904. The accident resulting in the death of Peters occurred on December 31, 1904. Sheridan was not then an accepted employee of the defendant, nor had he any regular employment with it except as a student until about a week before the accident. He was however, put upon the payroll of the company December 1, 1904, although he then did not work every day, being only employed as an extra man and when occasion required. About a week before the accident he was put on as an extra man as head brakeman on a construction train under the control of Conductor Brown, the crew of which, in railroad parlance, was known as the "Chain Gang." The term "head brakeman" does not indicate superiority in rank over any other brakeman, but is merely used to designate the one whose position is at the front of the train as distinguished from the rear brakeman. On the morning of the accident Sheridan was engaged in making up the construction train, consisting of some thirty-two cars loaded with dirt and which were situated on various side tracks of the

defendant at its depot in Suisun. To make up this train and hold it on one of the side lines known as the "fruit line," to await the passage of the Oregon Express, which was known to be due, and had the right of way, Sheridan, as was his duty, attended to the switching, which necessitated the opening of the main line switch and side line switches in order to get the train on the fruit line. In order to get upon the side line track and make up the construction train in readiness to pass out after the Oregon Express had gone through, Sheridan opened the main line switch so as to allow the engine of the construction train to pass from the main track to the side lines. As the engine passed in from the main line Sheridan jumped on it and proceeded through the side lines, opening up the necessary inside switches. The evidence warranted the jury in finding that he never returned to the main line switch after he had opened it and the engine had passed through it. After he had coupled up the various cars on the side lines and had made up the train and got it in readiness to proceed after the Oregon Express had passed, he left the train and went down to the depot where he remained with no particular object in view for a short while and returned to the construction train, on the engine of which he with the other employees was seated, when the Oregon Express came down the line, and passed through the open switch, with the resulting collision and death of Peters.

There was evidence showing that the railroad premises at Suisun were considered among railroad men as a very difficult place to switch in on account of the many main line trains coming in and going out; trains being due in the morning and afternoon, and branch tracks running in and out of the place; that the situation there was complicated and there was not much time in going in and out on the main line; that on account of these conditions it required skillful, experienced, and alert men to meet them and that, considering the training Sheridan was shown to have had as head brakeman up to the time of the accident, he was not sufficiently experienced to discharge the duties of head brakeman at a place like Suisun.

It was shown in evidence that one of the rules promulgated by the defendant pertaining to the duties of a brakeman in switching, and numbered 336, provided that "At points where

trains meet or pass, an employee attending the switch will, after locking it to the main track, take position on the opposite side of the track from the switch, stand and remain there until the expected train has passed." While the application of Sheridan to be permitted to go into the probationary employment of the defendant recited that he had received a copy of the rules, the fact is that defendant never furnished him with them. Nor does it appear that anyone instructed him as to these rules or his duty under them in switching, or that he had ever possessed a copy of the book of rules, or had read them, or knew anything about this one relative to his duties in main line switching.

As to how far Sheridan had been instructed in his duties as brakeman, the experience he had, and the precautions which had been taken by defendant to determine his qualifications to act as such before assigning him to that position, various experienced conductors of the defendant, who had served as head brakemen before their advancement as conductors, together with one of the brakemen who worked on a train with Sheridan, and the examining agent of the defendant were produced as witnesses. The student brakemen are placed in the charge and under the direction of conductors. Sheridan was originally placed with Conductor Brown and served under him for thirty days prior to November 12, 1904, on a run between Oakland and Port Costa. This was his main continuous student service. On November 14, 1904, he made one trip with Conductor Rumsey between Tracy and Oakland. On November 15, 1904, he made another trip with Conductor Miller of some eight or ten hours between Lathrop and Fresno. On November 16, 1904, he made a run with Conductor Phillips between Sacramento and Oakland. All of these conductors—Brown at the end of thirty days—and the others at the end of the respective runs on which Sheridan accompanied them, gave him certificates to the superintendent of the division of the defendant, setting forth the fact that Sheridan had been with them for the periods above indicated, and that either his work was very satisfactory or seemed to be. Scott, a rear brakeman under Conductor Hughes, and the only brakeman called who had been upon any train on which Sheridan was a student, testified that during the thirty days of Sheridan's studentship he performed the duties which were

assigned to him "very nicely." The testimony of this particular witness may be dismissed, however, with the statement that under his testimony it does not appear that he knew of any duty which was assigned to Sheridan, or that he ever saw him do anything. The duties of this witness were those of a rear brakeman; Sheridan was not under his supervision and did not work with him, but was with the other brakemen on the train, of whom there were several.

As to the conductors. Under the system of the defendant these conductors were required to take care and supervision of the student brakemen and to see that they were properly instructed in their duties; to observe their work and determine whether they displayed sufficient intelligence and became sufficiently skillful and proficient in the discharge of their duties to warrant a satisfactory report to the superintendent. Having devised this system for determining the capability and competency of men seeking employment in situations where the safety of employees in the operation of its road and of passengers upon its trains was imperiled, the responsibility for neglect upon the part of its conductors to take reasonable precautions and care to determine the qualifications of such prospective employees must be borne by the defendant. It was not only the duty of the railroad company to devise a proper method under which its student brakemen might be properly instructed in the duties of their position, and whereby, after such probationary period, it could be determined whether they were sufficiently competent to be entrusted with those duties, but the duty further devolved upon the railroad company to see that those who were charged with this duty performed it. When we examine the testimony of the conductors whose duty it was to supervise the work of Sheridan and to instruct him and observe how far he became proficient in its discharge before reporting to the superintendent in his favor, we find that, aside from their testifying that Sheridan appeared to be an intelligent young man, it does not appear that they ever saw Sheridan perform any of the duties of a brakeman.

Take the testimony of Conductor Hughes, under whose supervision Sheridan is supposed to have mainly acquired whatever knowledge of his duties he possessed at the time of the accident. This conductor testified that Sheridan appeared

to be an intelligent young man, and as far as his testimony discloses, or that of any of the other conductors with whom he afterwards made short trips, this aside from the fact that he was with them at the time and on the trips above referred to, is apparently all they knew about him. None of them appeared to have taken any interest in him or any supervision over him except such as followed from his presence on their train with the other brakeman, and as far as any instructions in his duties are concerned, if any were given him (and even Sheridan himself does not say he was given any) they were received from the other brakemen on the train, none of whom, with the exception of Scott, testified in the case. None of these conductors appear to have ever given Sheridan any instructions or to have observed his work; none of them claim to have seen him perform any of the duties of a brakeman—head or rear—nor that they ever saw him at a switch either opening or closing it or assisting others in doing so, or that any switch work was done while Sheridan was under their supervision. Hughes gave Sheridan his certificate of competency, not on any knowledge that he himself had acquired of the capacity of Sheridan from an examination of him or observation of his work, but solely at the request of Scott, the rear brakeman above referred to, and simply on the assurance of the latter that he thought Sheridan was entitled to it.

As far as the testimony of Sheridan is concerned, it was only of a general character, to the effect that while in the service of the defendant prior to being employed on the construction train, he assisted the brakemen in performing their duties. What the duties of a brakeman are does not appear from the evidence. They doubtless involve switching, but for all the evidence discloses, may have required other duties in the operation of trains. However, it does not appear that prior to the day of the accident Sheridan ever turned or assisted in turning a switch. As far as the evidence shows the morning of the accident was the only time he had done so. Conductor Brown, in whose charge the construction train was, and who had control over Sheridan, gave him no instruction whatever when he assigned him to the duty of head brakeman that morning, and in testifying to the capability of Sheridan while in his employ during the week preceding the day of the accident, testified that "in reference to his duties as brake-

man he acted as an ordinary man with that amount—with what we would term a green man would act; nothing unusual in his actions."

The only other evidence in the case introduced for the purpose of supporting the claim of appellant that proper care had been exercised to determine the competency of Sheridan before his employment was that of J. H. Burnham, who on November 21, 1904, was the examiner for the defendant and who certified that on that date he had examined Sheridan and that the latter "fully understood all of the rules required in his position of brakeman."

Having set forth the evidence brings us to a consideration of the particulars, above set forth, in which it is contended by appellant that it is insufficient to sustain the verdict.

On the point that the evidence did not show that Sheridan left the main switch open, in addition to what we have set forth on that subject, Brown, who was conductor of the construction train on the morning of the accident and a witness for defendant, stated that some fifteen minutes before the accident he looked up the track from the depot, a point some eight hundred or one thousand feet from the main switch, and knew that the switch was closed from the fact that the red target or disc located at the switch, and which by its position would indicate whether the switch was open or closed, showed him it was closed. This was the basis for his statement, as he did not pretend to be able to state whether in fact the switch was open or closed, as when it is open its width is but about a quarter of an inch, and its actual condition unobservable by a witness at the distance he was from it. Littlejohn, the engineer of the construction train, also a witness for defendant, did not know who opened the main line or side line switches to make up the construction train on the side line; whether it was Sheridan or some other employee on the construction train. He testified, however, that Sheridan closed the main switch after they had gotten through with the switching on the side track. According to the testimony of this witness, while Sheridan closed the switch, there is no doubt that at the time the Oregon Express came along it was in fact open. This witness, with other employees, was seated on the engine of the construction train waiting for the express to arrive, and as it came along he looked ahead and saw that the main

switch was open; that the express was coming through, and called on the others who were with him including Sheridan, to jump and save themselves from the collision which was inevitable. On the other hand, Sheridan, the man charged with leaving the switch open, is not so certain after opening it whether he closed it or not. He testified in response to the inquiry, "Who opened those switches?" (referring to the main switches and side switches) "I think I did. ·I think I closed them. I am not sure· about that. I don't know whether I closed them or the other brakeman closed them." Again, after stating that he knew it was his duty to line the switches up on the main track after the engine had passed through it, and that as far as he knew he did so, he testified that there was a possibility that he might have left the main switch open, and, on inquiry as to whether there was not a probability that he had failed to close it, answered, "Well, I don't know as to that. I don't know. It might have been and it might not have been." In addition to this there was produced a written report made to the defendant immediately after the accident, which stated that Sheridan had caused it.

Now the fact is that the main switch was open when the Oregon Express came along; that the only one who handled this switch was Sheridan; that after he opened it and the construction engine was backed down upon the track, he left it open and never went back to it. It is not pretended that any one else except Sheridan was seen in the vicinity of the switch at any time after the construction engine passed through it, or that any one else had anything to do with opening or closing it. Under these circumstances, notwithstanding the testimony of other witnesses that they observed the switch closed, the jury were not bound to believe them. The express train could not have gotten through except the switch was open. It would be idle to discuss the suggestion of appellant that the Oregon Express may have run into the switch because the "locomotive may have jumped the track or (on account of) many other contingencies which might be suggested." What these other contingencies might be is not suggested. One would be at a loss to conjecture what they might be, and the suggestion that the locomotive of the express may have jumped the track is disposed of by the uncontradicted evidence that certainly at the time the express entered the

siding through the main switch that main switch was open. How it happened to get open if Sheridan closed it might be a question, but in view of the fact that it was undoubtedly open when the express approached, that Sheridan was the only person who operated it, that he had opened it and was doubtful as to whether he had closed it or not, the jury were warranted in finding that he had in fact not closed it, and the accident was due to negligence on his part in that respect.

The jury being warranted in finding that Sheridan had failed to close the main line switch, brings us to the next proposition advanced by appellant,—namely, that, assuming the finding of the jury that Sheridan left the main switch open is supported by the evidence, still the evidence shows that Sheridan in fact knew what his duties were relative to the main line switching, and that his negligence respecting it was an act of mere personal negligence on his part, for which the defendant was not responsible.

It is no doubt true that where an employee has been for years engaged in the performance of duties, and has theretofore performed them properly—in other words where full knowledge of his duties is to be presumed from years of employment in their discharge—a single act of negligence on his part may be attributable to remissness in discharging known duties, rather than attributable to ignorance and incompetency respecting their proper performance. But no such situation was presented here. Sheridan had but recently gone into the employment of defendant, and the very question under consideration by the jury on this branch of the case was whether when accepted as an employee of defendant he had sufficient knowledge of the duties of a brakeman, derived from either instruction, experience, or familiarity with the rules of the company. It bore on the fact of incompetency, independent of any question whether the defendant had exercised ordinary care and prudence in ascertaining the qualifications of Sheridan. And the finding of the jury that Sheridan was in fact incompetent to properly discharge the duties of head brakeman and switchman at the time of the accident was fully warranted from the evidence alone showing that he was entirely ignorant of the requirements of rule 336 of the defendant relative to his duties in main line switching, and which ignorance directly contributed to the accident. That

rule expressly required, as we have quoted it above, that "at points where trains meet or pass, an employee attending the switch will, after locking it to the main track, take position on the opposite side of the track from the switch, stand and remain there until the expected train has passed."

The situation on the morning of the accident was exactly that which called for the knowledge by Sheridan of his duties as brakeman respecting it, so that such duty might be performed as the rule prescribed. The switching from the main track had been done for the purpose of making up the construction train, and, as made up, it was waiting under orders the arrival and passage of the Oregon Express, to allow it to pull out and proceed on its way on the main track. It is hardly open to discussion that this rule is one of the most important governing the conduct of employees respecting switching. The extreme peril to the lives of co-employees and to passengers upon trains occasioned through main track switching called for the greatest precaution upon the part of the railroad company, in order to prevent accidents through the negligent operation of such switches. The defendant recognized that danger and attempted, as far as possible, to prescribe a rule for switchmen which would prevent accidents from open switches. Sheridan was entirely ignorant of this rule in as far as it required him, even after he had locked the switch to the main track (which of course the jury found, and was warranted in finding he did not do) to take a position on the opposite side of the track from the switch and remain there until the Oregon Express had passed. It may be conceded, as Sheridan testified, that he knew it was his duty to close the switch and lock it after the construction train had passed through, and it may be further conceded that a failure to do this alone would have been but an act of personal negligence— negligence committed by the employee with knowledge of how he should have properly discharged his duty. But the duty cast upon Sheridan under the rule required more than to close and lock the switch; it required him to take his post at the switch even if he had in fact locked it. This was the explicit requirement of the rule and its purpose is obvious. The company recognized that employees will be careless, and the rule was to provide as great precaution against such negligence as possible. Had Sheridan known of this rule and taken his

position at the other side of the switch, as the rule required, it is hardly conceivable that the accident would have happened. If he had assumed the position which a knowledge of his duty would have required, he would undoubtedly have discovered that the switch was open long before the express approached and the accident would have been averted. It goes without saying that an employee of a railroad company who is ignorant of important rules governing the discharge of hazardous duties assigned to him is an incompetent employee, and the jury upon this evidence alone, to which we have called immediate attention, was warranted in finding that Sheridan was so incompetent.

The jury being warranted under the evidence in finding that Sheridan was in fact incompetent to act as a head brakeman in switching, by reason of his ignorance of the essential rules prescribed by the defendant for the proper discharge of his duties as such, leaves little to be discussed upon the claim of appellant that the evidence shows that it had taken reasonable care and precaution to either instruct Sheridan as to his duties or to ascertain his skill and qualifications before assigning him to a performance of them. Whether an employer has taken reasonable precautions to instruct a prospective employee in the proper discharge of the duties of a position he desires to fill, or whether reasonable investigation into his qualifications has been preliminarily made before assigning him to duty, are peculiarly matters to be determined by a jury from all the circumstances disclosed by the evidence. We have already set forth all that was done by the defendant during the period when Sheridan was under the control of its conductors, serving out his probationary period as a student brakeman. We make no question about the soundness of the system devised by the defendant for making its contemplated employees practically familiar with the duties of the positions they desire to fill. It provides for actual work by the student brakemen in the operation of the road, under competent employees, who are capable of instructing them in the proper discharge of their duties, at the same time that it provides for a final examination, after the probationary period, by an examining officer of the defendant, whose duty it is to inquire into the qualifications of the applicant for acceptance into the service of defendant. When followed, this system of instruc-

tion and examination doubtless affords as efficient a method as might be devised for insuring the employment of those who are skillful and competent. Under the evidence here, however, the jury was warranted in finding that there was a theoretical instead of a practical application of the system, at least in the case of Sheridan. While he made some trips, which were supposed to give him practical instruction, by assisting in the work of brakeman, it does not appear definitely that he ever did anything except to make the runs. It does not appear that he ever opened any switch, or assisted in doing so, on any trip he took, and none of the conductors issuing him certificates of competency ever saw him perform any of the duties of a brakeman. They issued the certificates in his favor, not because they were satisfied from any work they saw him do that he understood how to do it, but because they were told by some of their brakemen that he appeared to be all right. It does not appear that he was given any instruction by any one. He was not furnished with a book of rules; was never instructed as to any of the rules; never read them, and as to the important rule 336, defining his duties as switchman with reference to the main switch, under the situation of the trains presented on the morning of the accident, he had never been instructed as to it, or knew anything about it.

It is true that the jury in response to one of the special interrogatories submitted to them, found that Sheridan had passed "a satisfactory examination as to qualifications for the position as brakeman." This had reference to the examination which Sheridan took before the examining officer of the defendant, J. H. Burnham, on November 21, 1904. As to the extent of this examination, the only evidence offered respecting it was the certificate of Burnham, which recited that "I have examined J. L. Sheridan on the rules and regulations which took effect June 15, 1903, and I find that he understands all of the rules required in his position as brakeman."

In view of the general verdict of the jury and its special findings that Sheridan was not sufficiently conversant with the rules of the defendant to discharge the duties of switching brakeman, and that defendant had not exercised ordinary care and prudence at the time that it employed him to perform the duties as such brakeman, the finding as to a satisfactory examination cannot be taken as meaning anything more than

that the examination that Burnham made was satisfactory to himself. But this is not the test to be applied. The examination or investigation on the part of the employer must be of such a reasonable affirmative character as will disclose, as a fact, whether the employee has such knowledge of his duties that he may safely be entrusted with employment.

Now, while the jury found that the examination by Burnham satisfied him that Sheridan possessed the necessary qualifications for the position of brakeman, the evidence warranted them, as the general verdict and the other special findings determined, that this examination did not measure up to that reasonable investigation and examination that the law requires. Burnham was trainmaster of the defendant. He did not remember Sheridan, or that he had examined him. He had never served in the capacity of a brakeman and his examination was made solely from the rules of the company—a theoretical examination. As the fact is, that Sheridan never read the rules and knew nothing about the requirements of rule 336, the jury were well warranted in ignoring Burnham's certificate that Sheridan "understood all the rules required in his position as brakeman," and in concluding that any examination Burnham put Sheridan through, was such an extremely limited and perfunctory one that it could not be characterized at all as a reasonable investigation, under which the capability of Sheridan could be or was determined because as he did not know rule 336, Burnham, if he had examined him respecting it, would have discovered his ignorance.

This disposes of all of the points made by appellant on the ground of insufficiency of the evidence, and, as we find none of them well taken, we proceed to consider other points made for reversal.

Complaint is made by appellant that the court erred in admitting testimony. Certain railroad men—old and experienced brakemen and switchmen—were permitted to testify as to what experience was required to fit a person as brakeman and switchman. We perceive no error in admitting this testimony. The management and operation of trains is a matter outside the experience and knowledge of ordinary jurors, and it is, therefore, a proper subject for expert testimony. Our code (Code Civ. Proc., sec. 1870, subd. 9) provides for receiving the opinion of witnesses on questions of science, art,

or trade where the witness is skilled therein. The occupation of a railroad brakeman is a trade, and the preparation and experience necessary to make a person competent to discharge its duties is peculiarly within the knowledge of experienced railroad men, particularly those who have followed that occupation. While it is true that the jury was to pass upon the question whether Sheridan was competent to discharge the duties of a brakeman when employed by defendant, it could ordinarily have no knowledge of what preparation and experience was necessary to render a brakeman competent. Only experts—men skilled and experienced in the trade of brakemen, could clearly inform the jury as to the preparation and experience necessary to make one competent in the trade, and their opinion in that respect was admissible.

Appellant likewise complains of the admission of testimony showing that Suisun was a particularly difficult place to switch in. We have set out the testimony in this matter above. The position of appellant is that in determining the competency of Sheridan, the average place or the whole road could alone be taken into consideration. But we think not. While the defendant was required to engage only men of average competency, that competency was to be measured by the condition and character of the duties they were to perform wherever they might be assigned on the road to do it, and if the conditions at Suisun presented difficulties and complications in switching different from those occurring in other parts of the defendant's road, plaintiff had a right to show it, as the duty of defendant was to assign an employee to discharge the duties of switchman at Suisun who was competent to meet the conditions existing there.

Nor is there any merit in the claim that the court erred in admitting evidence to prove the average rate of wages which the deceased was receiving at the time of his death. There was, it is true, as appellant asserts, no allegation in the complaint as to the earning capacity of the deceased. The allegation was that by reason of the death of deceased plaintiff had suffered damages in the sum of fifty thousand dollars. It was not necessary to specially aver the particular loss sustained to the wife and minor children of the deceased by being deprived of the benefit of his future wages through his death. This was not a matter for special pleading. Loss of the benefit

of earnings which the deceased might have secured by his trade, and which would have gone to the benefit of his heirs or personal representatives—his wife and children here, for whose benefit this action was prosecuted under the statute—is one of the elements of damage which with loss of comfort, society, and protection of which the family were deprived by his death, go to make up the whole damage proximately caused by his death, and for which recovery may be had. (Civ. Code, sec. 3333.) The pecuniary loss which the wife and children suffered by being deprived of the benefit of what the husband would have probably earned and accumulated during the residue of his life, had he not been killed, is damage sustained as a natural and ordinary effect of his death, and is one of the elements of damage which may be proven under a general allegation of damages. (*Bond* v. *United Railroads of S. F.*, 159 Cal. 270, [113 Pac. 336].) We are not cited to any authority by appellant sustaining its contention to the contrary, and have found none.

Appellant questions the correctness of some of the instructions of the court, but we deem it necessary to examine in that respect but one claim. This is an attack on an instruction of the court as to the rule to be applied by the jury in assessing damages, should they find for plaintiff, and in this respect instruction 17 is particularly criticized. That instruction, as far as pertinent, reads as follows: "Pecuniary interest of children in the loss of their parents does not necessarily end with their arrival at the age of majority, but the jury may allow for the probable loss of any benefit, if any, of a pecuniary value, which a child would probably receive from its parent after arrival at majority. Such damages are not limited to the actual pecuniary damage sustained by the plaintiff by reason of loss of services of deceased. Damages must be confined to pecuniary loss suffered, including comfort, society, support and protection of the deceased. . . . Grief, mental suffering and sorrow cannot be awarded for."

The first point made is against that portion of the instruction just quoted contained in the sentence which declares that "the pecuniary interest of children in the lives of their parents does not necessarily end with their arrival at the age of majority," etc. Counsel concedes that this portion of the instruction, as far as it bears on the subject of pecuniary dam-

age, is similar to one considered and sustained in *Redfield* v. *Oakland C. S. Ry. Co.,* 110 Cal. 288, [42 Pac. 822, 1063], but questions the correctness of the rule as laid down in that decision. The accuracy of this rule has, however, come up for consideration several times since the Redfield case was decided and has been sustained. (*Valente* v. *Sierra Ry. Co.,* 158 Cal. 412, [111 Pac. 97]; *Simoneau* v. *Pac. E. R. Co.,* 159 Cal. 495, [115 Pac. 320]; *Bond* v. *United Railroads of San Francisco,* 159 Cal. 270, [113 Pac. 366].) So that it must now be considered as the settled law in this state on the subject.

Particular exception is taken, however, by appellant to that portion of the instruction which reads: "Such damages are not limited to the actual pecuniary damage sustained by the plaintiff by reason of loss of services of deceased." It is claimed by appellant that under this instruction the jury are not limited to a consideration of pecuniary damage alone, but it permitted them, while considering one element constituting it,—namely, loss of services, to determine for themselves what other elements might be taken into consideration and thereby permitted an unrestrained latitude for the play of emotional influences on the part of the jury, even to the extent of assessing punitive damages against the defendant. Whatever criticism this particular sentence of the instruction may be subject to standing alone, it is the established rule in this state that it is not the fair test in considering whether the jury has been properly instructed in a given case, to take into consideration excerpts from a particular instruction, or a single instruction given in a cause. On the contrary, the rule is firmly established here that the correctness of instructions to a jury is not to be determined by taking particular portions of one instruction or another and considering it alone. All of the instructions which are given must be considered—taken as a whole—and if, when so examined, they lay down a correct rule for the ascertainment of damages, that is all that is required. When such consideration is given to the instructions here, in their entirety, it is quite apparent that the jury was properly instructed.

It is too well settled in this state to be now open to question that in actions of this character the plaintiff is entitled to recover for all pecuniary loss sustained, and as elements in determining that pecuniary loss the jury are to take into con-

sideration the loss which the wife and children have sustained through being deprived of the comfort, society, support, and protection of the deceased by the wrongful act of the defendant. (*Beson* v. *Green M. G. M. Co.*, 57 Cal. 35; *Redfield* v. *Oakland C. S. Ry. Co.*, 110 Cal. 277, [42 Pac. 822, 1063]; *Dyas* v. *Southern Pacific Co.*, 140 Cal. 296, [73 Pac. 972]; *Valente* v. *Sierra Ry. Co.*, 158 Cal. 412, [111 Pac. 97]; *Bond* v. *United Railroads of S. F.*, 159 Cal. 270, [113 Pac. 366].)

That the jury were told that they should take these elements into consideration alone in determining the pecuniary loss and should take no other matters into consideration, is quite clear from instruction 17 taken in its entirety. But if there might be any doubt upon that subject it is dissipated when all the instructions given as to the rule for measuring damage are considered.

After instructing the jury that the action which they were trying was a statutory one enacted for the purpose of allowing the heirs to recover for pecuniary damages suffered by the loss of a relative, the court then proceeded in instruction 17 to instruct them that pecuniary damage was not limited to that sustained by them by loss of the services of the deceased, but that they were entitled to damage for pecuniary loss suffered, including comfort, society, support, and protection of the deceased, and that grief, mental suffering, and sorrow could not be awarded for. By instruction 19 they were told that as an element in determining such pecuniary loss they could take into consideration "what the deceased would probably have earned and accumulated by his labor in his business or calling during the residue of his life, and which would have gone to the benefit of his heirs and personal representatives, taking into consideration his age, health, habits of industry, ability and disposition to labor, and the probabilities of his length of life." By instruction 20 they were told that the measure of damages is not alone this pecuniary loss sustained as just explained in instruction 19, but in addition they could take into consideration the pecuniary loss, if any, sustained by them by being deprived of the comfort, society, support, and protection of the deceased.

Now taking these instructions as a whole, it appears that the jury was instructed that damages for pecuniary loss were all that could be awarded. This was the standard by which the

damages were to be measured, and the elements which were properly to be taken into consideration in determining those damages, they were told, was the pecuniary loss sustained through being deprived of the support of the deceased—because the instruction regarding pecuniary loss through being deprived of the earnings of the deceased which would have inured to the benefit of the family had reference to the support—together with the pecuniary loss of being deprived of the comfort, society, and protection of the deceased. But one standard for measurement of the damages was given to the jury—the standard of pecuniary loss—with a proper statement of the several elements going to make up the standard,—namely, loss of support, as one element, the other element, loss of comfort, society, and protection. They were expressly instructed that grief, mental suffering, and sorrow, could not be considered. Hence, taking the instructions as an entirety the jury were properly confined by them to a consideration of the proper elements under which to determine pecuniary loss, and pecuniary loss alone, which the plaintiff might have sustained, and they were cautioned as to those matters which might not be taken by them into consideration at all. In this view there is no merit in the criticism of appellant directed against the instructions.

The claim that the verdict is excessive is not based on any suggestion that if plaintiff was entitled to recover, the amount of the award was improper. The peculiar claim in this respect is that the verdict must have been excessive because, as asserted by appellant, there was no evidence upon which a verdict could under any circumstances be awarded, which claim, if it required any answer from us at all, is answered by our discussion of the evidence and the conclusion which we have reached respecting its sufficiency to sustain the verdict.

There are no other points made requiring consideration.

The order appealed from is affirmed.

Shaw, J., Melvin, J., Sloss, J., Angellotti, J., and Henshaw, J., concurred.

Rehearing denied.