[Civ. No. 8287. First Appellate District, Division One.—September 1, 1932.]

H. E. FARRELL, Respondent, v. MIRAMAR HOTEL COMPANY, LIMITED (a Corporation), et al., Defendants; GILBERT F. STEVENSON, Appellant.

Richard L. North for Appellant.

Fogel & Beman and John W. Loucks for Respondent.

BEAUMONT, J., *pro tem.*—This is an action to rescind a contract on the ground of fraud. In 1926, Gilbert F. Stevenson and his wife owned certain real property in Santa Monica upon which were situated a hotel and an apartment house. A corporation was formed, at their initiation, under the name of Miramar Hotel Company, Limited. The real property, subject to a mortgage of $500,000, was conveyed to the hotel company, as said corporation will be hereinafter designated. The consideration for this transfer was 799 shares of the capital stock thereof, issued under permit from the corporation commissioner. The corporation commissioner also gave permission to the hotel company to sell to the public 701 shares of its capital stock for the purpose of obtaining funds necessary for construction of an addition

to its building. All money so realized was to be impounded until released by the commissioner. At the time of the formation of the hotel company, another corporation was organized under the name of Miramar Club of California. This corporation was formed for the purpose of conducting a "beach club" in conjunction with the hotel. The Stevensons were the owners of substantially the entire outstanding stock of both corporations. Clyde R. Commons was employed by Gilbert F. Stevenson to sell certain of his shares of the capital stock of the hotel company and "founders'" life memberships in the club. He, in turn, employed one J. E. Griffin as a salesman. Griffin effected a sale of two shares of stock and two memberships to H. E. Farrell. Action was instituted against both corporations, Gilbert F. Stevenson and wife. Judgment of nonsuit was entered as to Mrs. Stevenson, and judgment was in favor of defendant corporations. Plaintiff recovered against Gilbert F. Stevenson in the sum of $3,300 and interest. Said last-named defendant has appealed upon the ground of insufficiency of evidence; that the decision is against law, and because of alleged errors occurring at the trial.

In August, 1926, appellant's agent, Griffin, called at respondent's home and, not finding him, left word that he desired to see respondent about a business matter. Respondent thereafter went to the office of Griffin, which was situated in the hotel company's building. Griffin told respondent he was selling shares of stock and units of the two corporations; that it was a sort of "two-headed concern"; that the plan was to be "a share of stock in the hotel company and a share of stock or a membership in the beach club"; that there was being issued "something like 2500 units or shares in this organization and with that money they were to build a hotel up on top of the palisades of the Miramar Park; they were to build a beach club below . . . These moneys that were to be raised by the sale of this stock, were to be put into that construction"; that the club "would own all the property". At the time of the negotiations, Griffin offered to sell respondent the stock on a part-payment plan, and stated he "was authorized by his corporation to make that allowance" to respondent. Respondent further testified that as a part of the inducement to purchase the stock, Griffin gave him a pamphlet upon

which appeared: "Statement of Physical Assets of the Corporation Which Owns the Miramar Properties . . ." This pamphlet contained a statement that there were 1500 shares of capital stock of which 795 were issued, and that the "balance are in the treasury unissued". It contained the further statement: "A new addition is to be built at once onto the present apartment wing." Respondent's testimony is further to the effect that relying upon the oral statements of Griffin and upon the printed instruments handed him by Griffin, he believed he was purchasing part of the unissued treasury stock of the hotel company; that so believing, he accepted Griffin's offer, signed the application presented to him by Griffin, and gave him a draft in favor of the Miramar Club for $1650; that if he had known the stock was the individual stock of appellant and not treasury stock, he would not have purchased it. The application respondent signed was headed "Miramar Club of California" and was for a "founder" membership, price $1650. Respondent, still relying on Griffin's representations and believing he was purchasing treasury stock, procured another share of stock and life membership September 4, 1926, this latter being for his son. Commons and Griffin maintained their offices for selling appellant's stock in the hotel building and it was there respondent carried on said negotiations. Neither Commons nor Griffin appeared at the trial as a witness. No treasury stock was sold to any person. Certificates for the two shares of stock and for the two memberships were delivered to respondent.

There was introduced in evidence a letter received by respondent, which is as follows: "Dear Mr. Farrell: Enclosed are two of the new blanks, which we hope are in accordance with the rulings of the Corporation Commissioner of the State. The original one signed by you, was found incomplete after consultation with him. Would you be so good then, to sign each of the white ones and mail in the enclosed envelope to Mr. Clyde R. Commons, 815 South Hill St., Los Angeles. It is merely a detail of complete and accurate records." This letter was dated October 6, 1926, and was signed by Griffin. The statement therein regarding consultation with the corporation commissioner was utterly false. One of the inclosures was an application for membership in the club, price $600, and the other was in part as follows: "Miramar Hotel Company Limited . . . A Cali-

fornia Corporation. Capital Stock $1,500,000. Divided into 1500 shares. All Common Stock and each share participates equally in the ownership, profits and management of the Corporation. I hereby purchase one share of the Common Capital Stock in the Miramar Hotel Company Limited of Santa Monica, California, for the sum of $1,050.00. . . . This application may be rejected by the Company by refund of moneys paid hereon.'' Both applications were dated September 3, 1926, when received by respondent.

Appellant's testimony, in part, follows: ''Q. Did you have anything to do with making the application to the Commissioner of Corporations for the permit to sell the stock of the Hotel Corporation? A. I consulted some lawyer probably who drew it up and he might have handed me the application to sign. Q. You did not read it, did you, when you signed it? A. Probably, it was owing to how much I trusted the lawyer that drew it· up. . . . Q. And you formed the corporation for the sale of that property? A. Some five years after I owned it, yes. Q. And before this date that you sold this stock to Mr. Farrell? A. Yes. Q. And you took some 700 shares of the common stock? A. For my interest, for my interest in the hotel. . . . The Court: I would like to ask a few questions. Mr. Stevenson, do you know how stock got into the hands of the broker or anyone else and was sold? A. He got it from me. He was appointed the person to handle it by me. He had a broker's license, and I was afraid to have anything to do with it myself, and I wanted all the printed matter made by one that had been successful in club work. Q. You authorized him to print anything that pertained to the sale of the stock? A. Yes, he was a broker to handle it in a legal way, and I did not pay any attention to it, to any printed matter that was put out. Q. What did you authorize him to do, if anything, about the sale of the stock? A. He used his own judgment about handling it. He had handled some other clubs and appeared to be an expert in that line. . . . Q. Do you know how the stock got into his hands, or in the hands of Mr. Griffin? A. Well, they made requisitions to have some stock issued about once a week, I think on Saturday afternoons, what they had to have issued. Q. What they had to have issued? A. What they

had sold, and they wanted the stock in order to deliver it. I had the stock; I was selling my stock. Q. You were selling your own stock? A. My own stock; that was the only stock that could be used, because the permit of the Corporation Commissioner was that the treasury stock was to build the hotel and I could not build that club and sell any treasury stock; I had to sell my own. It cost about $150,000.00 to furnish that down on the beach there, and I put my stock money that I received in to that club. If I had sold treasury stock how could I use the money for that? I advanced the money to build that club. Q. And then took some security for it, did you? A. No security only what security I have by controlling the Board of Directors of it. Q. You did not donate that money to the corporation? A. No, it stood on the books as they owing that much for what I advanced to build it. But the club is out of debt and is considered one of the finest on the beach. Q. Did Mr. Commons ever show you any of the printed matter? A. Why, yes. I would see it on his desk when I would go in there. Q. Have you ever seen any of these forms that he was using? A. I would look at them, I would ask him if they were all right, if I said anything to him, yes. . . . Q. And you think you have seen both of these forms and knew he was using these forms to sell the stock? A. Why, I probably have. I would not pay much attention to them only ask him if they were all legal. Q. I am referring to Plaintiff's Exhibit 1 [the first application] and Plaintiff's Exhibit 4 [applications inclosed in Griffin's letter of October 6]. Then you did see Mr. Griffin in the office there? A. Why, yes. Q. And you knew he was one of the salesmen? A. He was one of Mr. Commons' salesmen, yes. . . . Q. When did Mr. Commons come into this transaction, what date? A. I don't remember. Q. Do you remember whether it was before or after the 24th of August, 1926? Q. Why, he was around there in July. Q. Was he working for you as your broker on the 24th of August, 1926? A. I presume so. Q. Are you sure that he was? A. I am sure he was working, yes. Q. Working as your broker? A. Yes. Q. At the Miramar Hotel? A. Yes. Q. On the date this transaction took place did you pay Mr. Griffin any money yourself, by your own personal check? A. I have paid Mr. Griffin part of

the money and handed the rest over for the other parties at his solicitation on account of needing money before the Judge [Commons] came down on Sundays or something. Q. At whose solicitation? A. Mr. Griffin's. Q. Then you have paid him money? A. That check that was left for me, that money Mr. Farrell testified he came down and left a check for his son's stock, and I knew what Mr. Commons' share would be to go to him, and I give it to him, and then Mr. Commons, the balance was settled up with him, yes.'' The check delivered to appellant by respondent on September 4, 1926, was made payable to the order of Miramar Club for the sum of $1650. It was indorsed: ''Miramar Club of California, By Gilbert F. Stevenson, Treasurer.'' It also contained a further indorsement as follows ''Pay to the order of The Citizens National Bank of Los Angeles, Cal. Western Mutual Life Assn. G. F. Stevenson.'' It appears that appellant was secretary and manager of the Western Mutual Life Association.

Fraud may be proved by circumstantial evidence. (*Hageman* v. *Colombet*, 52 Cal. App. 350 [198 Pac. 142]; 12 Cal. Jur. 829.) The burden was upon respondent to establish the existence of fraud, the presumption being in favor of fair dealing. (12 Cal. Jur. 816.) Nevertheless, as was said in *Eade* v. *Reich*, 120 Cal. App. 32 [7 Pac. (2d) 1043], ''fraud need not be proved beyond a reasonable doubt (*Bullard* v. *His Creditors*, 56 Cal. 600, 603), it being sufficient if it be established by a preponderance of the evidence (Code Civ. Proc., sec. 2061, subd. 5; *Noll* v. *Baida*, 202 Cal. 98 [259 Pac. 433]). As the court said in *Edmonds* v. *Wilcox*, 178 Cal. 222 [172 Pac. 1101, 1102]; ' . . . All judicial expressions concerning the necessity for clear and satisfactory proof of fraud must be construed in the light of the fundamental rule that a preponderance of evidence controls in a civil case.' ''

We are convinced the testimony of respondent, together with the circumstances disclosed by the evidence, amply sustains the court's finding as to fraud. Certainly the letter of October 6, 1926, containing the two applications, is evidence from which intent to deceive may be inferred. (12 Cal. Jur., pp. 830, 831; *Butler* v. *Collins*, 12 Cal. 457; *Walberg* v. *Underwood*, 41 Cal. App. 679 [183 Pac. 254]; *Smith* v. *Reynolds*, 94 Vt. 28 [108 Atl. 697]; 27 Cor. Jur.

40.) We quote here, as particularly applicable, the finding of the court regarding the letter. It is as follows: "The reference to the Corporation Commissioner was pure fiction. The writer had not consulted the Corporation Commissioner, and there was no effort to comply with his rulings." This is fully sustained by the evidence. There is no question that respondent relied on the statements made to him, and in particular that he believed he was purchasing treasury stock of the hotel company. And there is no question as to agency. The evidence shows appellant gave Commons and Griffin full power to make the representations they made. In fact, the issue as stated in appellant's brief is: "The entire case has dwindled to the single proposition of whether or not appellant represented to respondent that the two shares of stock in Miramar Hotel Company, Limited, purchased by respondent, were treasury stock, and said paragraph VI of the findings of fact decides that he did." In addition, however, appellant calls attention to paragraph XIV of the findings, which is to the effect that appellant, and not the hotel company or the club, received the proceeds from the sale of the stock and memberships. We have heretofore referred to the evidence regarding this, and we are of the opinion that it sustains the finding so attacked.

Appellant urges that the decision is against law. He claims that even if fraud be conceded, it has not been shown that respondent suffered injury. What would have been respondent's situation, if there had been no fraud? The money he paid for his stock would have gone into the treasury of the hotel company, to be used for constructing a new building which had been deemed for the best interests of the hotel company's business. The proceeds of the sale of the memberships in the club would have been used for the erection of the club improvements and nothing more would have been spent therefor. Consequently, there would have been no indebtedness on that score against the club. What was respondent's real position? He and the others who purchased stock in the hotel company had their stock, but the money paid therefor was not used for the improvements considered advisable for the best interests of the company, and it was not available therefor. As to his membership in the club: Far greater and

more expensive improvements had been made to the club properties than had been represented to respondent would be made, and the cost of all of those provided by the money "advanced" by appellant was an outstanding indebtedness against the club. We believe there was injury under the principles announced in *Spreckels* v. *Gorrill*, 152 Cal. 383 [92 Pac. 1011], and *Munson* v. *Fishburn*, 183 Cal. 206 [190 Pac. 808]. (See, also, *J. B. Colt* v. *Freitas*, 76 Cal. App. 278 [244 Pac. 916]; *Denovan* v. *Golden State Woolen Mills*, 104 Cal. App. 504 [286 Pac. 714]; *Stillwell* v. *Rankin*, 55 Mont. 130 [174 Pac. 186]; 12 Cal. Jur. 766, 767.)

■ Appellant complains of the denial of the motion for a nonsuit as to appellant. The motion was specifically made on the ground that no misrepresentation was made. The evidence we have heretofore referred to as to the making of the representations was before the court for consideration at the time the motion was acted upon. The motion was properly denied. In addition, there was no prejudice to appellant when the entire evidence is considered. ■ "If, upon the conclusion of the whole case, there is evidence upon the material issues warranting the submission of the cause to the jury, the question of whether the court erred in denying a nonsuit becomes of no consequence." (*Peters* v. *Southern Pac. Co.*, 160 Cal. 48, 52 [116 Pac. 400, 402].)

Judgment affirmed.

Knight, Acting P. J., and Cashin, J., concurred.