[Civ. No. 16078.   First Dist., Div. One.   Jan. 27, 1955.]

ROLLAND OLDIS, Respondent, v. LA SOCIETE FRAN-
CAISE DE BIENFAISANCE MUTUELLE (a Corpora-
tion) et al., Appellants.

Hadsell, Murman & Bishop, Lamb, Hoge & Killion, Phil F. Garvey, Peart, Baraty & Hassard, George A. Smith, Alan L. Bonnington, Keith, Creede & Sedgwick and John S. Howell for Appellants.

Heller, Ehrman, White & McAuliffe and Appel, Liebermann & Leonard for Respondent.

WOOD (Fred B.), J.—During or shortly following a major operation performed November 6, 1951, plaintiff sustained a third degree burn which considerably extended the period of his hospitalization. He sued doctors, nurses, and the corporation which owned and operated the hospital, recovering damages in the sum of $16,000 after a trial before the court without a jury.

He tried the case upon the theory that the doctrine of res ipsa loquitur as expounded in such cases as *Ybarra* v. *Spangard*, 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258], is applicable. The court found that "following said operation, for a period of the next four days, plaintiff was confined to a bed in said hospital, virtually helpless, drowsy, in a semi-conscious state with his perception of pain lessened from the effect of said operation and the administration at regular intervals of pain relieving drugs and sedatives"; that during said period "defendants, and each of them, carelessly, negligently and unskillfully cared for and treated plaintiff"; and that "as a proximate result of the negligence and carelessness

and lack of skill on the part of defendants, and each of them, plaintiff was caused to and did sustain the following injuries: A deep and severe third degree burn on his abdomen, and a severe nervous and physical shock."

*Question: Does the evidence support the findings? Our examination of the record convinces us that the answer is "Yes."*

Plaintiff went to surgery in the morning of November 6th. He returned from surgery shortly after noon of that day. The burn was discovered on November 9th, following, about 10 a. m. Sometime during that period the injury must have occurred. He testified he did not and does not know what caused the burn; testimony which, in support of the findings, we must assume the trial court believed.

These facts brought the doctrine of res ipsa loquitur into play. As said in *Ybarra* v. *Spangard, supra,* 25 Cal.2d 486, "Every defendant in whose custody the plaintiff was placed for any period was bound to exercise ordinary care to see that no unnecessary harm came to him and each would be liable for failure in this regard. Any defendant who negligently injured him, and any defendant charged with his care who so neglected him as to allow injury to occur, would be liable" (p. 491); "[i]t should be enough that the plaintiff can show an injury resulting from an external force applied while he lay unconscious in the hospital; this is as clear a case of identificaton of the instrumentality as the plaintiff may ever be able to make" (p. 492-493); "where a plaintiff receives unusual injuries while unconscious and in the course of medical treatment, all those defendants who had any control over his body or the instrumentalities which might have caused the injuries may properly be called upon to meet the inference of negligence by giving an explanation of their conduct." (P. 494.)

The ruling in the Ybarra case was later summarized by our Supreme Court in *Summers* v. *Tice,* 33 Cal.2d 80, 86-87 [199 P.2d 1, 5 A.L.R.2d 91], and expressed in these words: ". . . a patient injured while unconscious on an operating table in a hospital could hold all or any of the persons who had any connection with the operation even though he could not select the particular acts by the particular person which led to his disability. (*Ybarra* v. *Spangard,* 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258].) There the court was considering whether the patient could avail himself of res ipsa loquitur, rather than where the burden of proof lay, yet

the effect of the decision is that plaintiff has made out a case when he has produced evidence which gives rise to an inference of negligence which was the proximate cause of the injury. It is up to defendants to explain the cause of the injury.''

Those principles are applicable in our case even though the plaintiff herein was not ''unconscious'' throughout the critical period. He was in great pain as a result of the operation and his senses were dulled by the administration of pain relieving drugs. That makes the more credible his testimony that he did not know what caused the burn, nor when it happened; testimony it might be difficult to believe if he had at all times been in full possession of his faculties.

It was quite natural for the court in the Ybarra case to include the ''unconscious'' state of the plaintiff therein as an element in its holding, for he was in fact unconscious at the time of his injury. But we do not think the court intended it to be regarded as an indispensable element in all cases, particularly in view of the following comment which the court made in the Ybarra case: ''The passenger sitting awake in a railroad car at the time of a collision, the pedestrian walking along the street and struck by a falling object or the debris of an explosion, are surely not more entitled to an explanation than the unconscious patient on the operating table.'' (P. 490 of 25 Cal.2d.) The same may, we think, be said of the patient who, as found in the instant case, was injured while confined to a bed in a hospital virtually helpless, in a semiconscious state, with his perception of pain lessened from the effect of an operation and the administration of pain relieving drugs and sedatives.

This question was factually involved in *Milias* v. *Wheeler Hospital*, 109 Cal.App.2d 759 [241 P.2d 684], a decision of this court, opinion by Presiding Justice Peters. There the patient was in a semicomatose condition and did not feel the overhot applications. We upheld the giving of instructions on the doctrine of res ipsa loquitur upon the ground that if the jury had found certain facts the doctrine would have been applicable. Indeed, a patient's knowledge that a burn followed the application of a heating pad does not necessarily amount to knowledge of the specific cause of the burn in the absence of knowledge whether ''the heating pad was defective or improperly adjusted, or that the compresses had been dipped in some harmful solution, or exces-

sive temperature, or several other causes." (*Foster* v. *Delgrave*, 129 Cal.App.2d 525, 527 [277 P.2d 408].) However, the facts of our case do not require us to go that far for the basis of our decision. ▮▮▮ We hold that plaintiff's semiconscious condition and his ignorance of the specific cause of the burn bring this case within the purview of the holding in the Ybarra case.

### PLAINTIFF'S HELPLESS SEMICONSCIOUS CONDITION AND IGNORANCE OF THE CAUSE OF THE BURN

Plaintiff was unconscious during surgery and for a short time thereafter. During the remainder of the period, because of postoperative pain, he received ⅛ grain of morphine sulphate, hypodermically administered, every two hours around the clock, 34 injections during the three days following the operation. There is evidence that morphine dulls the mentality, slows the reactions and cuts down the feeling of pain, makes the patient sleepy and drowsy; repeated doses have a cumulative effect and could prevent a patient from feeling the pain caused by a third degree burn. Plaintiff's resultant condition during this period was described as groggy, tired, confused mentally, quite confused; at times he blacked out. During this three day period plaintiff was severely ill, very sick. He was recovering from one of the most painful operations known to medical science, the cutting out of the sympathetic nerves next to the spinal column. Oxygen was administered through a tube in the nose from time to time; and intravenous injections were administered to raise the blood pressure. There was a drainage tube inserted into the chest cavity, through the incision in his back, and connected to an underwater suction apparatus. At times a rectal tube was inserted. Through November 9th he had a relatively high fever and was at intervals injected with doses of penicillin. He lay helpless, unable to move except when shifted by a nurse. The bed was not cranked up. The first two days he was unable to talk; he just moaned.

The burn was severe, of the third degree, and located on the right lower quadrant of the abdomen a little below the belt line. Yet, plaintiff did not know he had been burned, nor how it happened. On the morning of November 9th he told the attending nurse "he had a cramp on the right side." He told her he had lain on that side. He referred to it as "a muscle cramp." He said it bothered him a little, but he didn't complain particularly and didn't say it was painful.

The nurse examined the area, discovered it red and blistered, and notified two of the doctors. It was some time after November 9th and before November 22d that plaintiff learned he had been burned. His remark to the nurse on November 9th about a muscle cramp was his first intimation to anyone of anything wrong on the right side of his abdomen. Plaintiff testified that before he learned he had been burned: "I had pain in the general region of my abdomen, particularly in the right side, and I didn't know what was causing it, had no idea whatsoever." "I do not know how it actually happened."

This summary of some of the evidence which tends to support the trial court's implied finding on this subject demonstrates that it is amply supported. There was conflicting evidence, including inconsistent statements by plaintiff upon deposition. But those conflicts were resolved by the trial court in favor of the plaintiff and the record furnishes a reviewing court no basis for disturbing that determination.

### DEFENDANTS' CONTROL OVER THE PLAINTIFF AND THE INSTRUMENTALITIES WHICH MIGHT HAVE CAUSED THE INJURY

There is evidence that during the three day period in question, the control, at one time or another, of one or more of the various agencies or instrumentalities which might have harmed plaintiff was in the hands of every defendant or his employees or temporary servants. This placed upon them the burden of initial explanation. ■ The test has become the "right of control rather than actual control." (*Ybarra* v. *Spangard, supra,* 25 Cal.2d 486, 493.)

■ Defendant Dr. Daniels was the surgeon in charge during the operation and subsequently. Defendant Page, an interne employed by the hospital, attended during surgery and participated in the postoperative care under the supervision of Dr. Daniels. Dr. Viscaino, Dr. Delaplaine and certain other employees of the hospital attended at surgery but were not made parties to the action. Defendant Dr. Rogers, an associate of Dr. Daniels, assisted the latter in the postoperative care. Defendant Dr. Cunha, surgical resident employed by the hospital, participated in the postoperative care under the supervision of Dr. Daniels. Defendants Sheeran, Salter and Dumelow were special nurses employed by plaintiff during this three day period. There was one eight hour interval when no special nurse was in attendance. During that interval and during temporary absences of special nurses

(as when absent for a meal) plaintiff was under the charge and control of staff nurses employed by the hospital. (As to a hospital's responsibility when its staff nurses are thus temporarily in charge of a patient, see *Timbrell* v. *Suburban Hospital, Inc.,* 4 Cal.2d 68, 70-71 [47 P.2d 737].)

Defendant Dr. Gilbert was the physician who referred plaintiff to Dr. Daniels for surgery. That would not, of itself, give Dr. Gilbert any element of control over or responsibility for the patient during the operation or during the period of postoperative care. But there is evidence that he did exercise control. Plaintiff entered the hospital for the first stage of the operation on October 22, 1951, and continued there until nearly two months after the second stage of the operation. On October 30th, Dr. Gilbert made an order prescribing Desenex powder for a fungus infection in the area of the patient's groin. Although disavowing responsibility for the care of plaintiff, Dr. Gilbert said in explanation of the making of this order, "the only reason I wrote that order was because he [plaintiff] said he had some irritation and that wasn't a surgical problem and so I wrote an order for Desenex"; he diagnosed it as a fungus infection; when he saw the patient a day or two later this condition was improving, it did not look as irritated; he did not later write an order discontinuing his order of October 30th; that order continued in effect until plaintiff went to surgery again on November 6th, it being the practice to treat as cancelled, upon return of a patient from surgery, any orders made prior to surgery, and to issue new orders for his medication and care.

Dr. Gilbert also testified that he called in to see this patient frequently; almost every day. He said "I just stopped in to see him, but I wasn't taking care of him." But when asked "you are not trying to infer that the visits that you made out there at the hospital were other than visits in a professional nature, are you?" he said "I am not trying to infer that." Asked if he saw the plaintiff between the time of the second operation [November 6th] and the day the evidence of the burn was brought to his attention [November 9th], he said "I don't think I did." He said he didn't remember as to those dates "but the record will show"; that he keeps records in his business office in connection with the visits he makes to the various people for whom his insurance organization provides medical service [plaintiff was such a person]; that those records should show each time he called in to see a patient; and that he did not consult those records before

coming out as a witness in this case. We find nothing in the record to indicate that he produced any of those records at any time during the trial.

Nurse Dumelow testified that after she discovered the burn Dr. Gilbert was the first doctor to come in; she had gone out of the room looking for Dr. Daniels; she saw Dr. Gilbert, told him the patient had blisters and would he come in and take a look; he did so; he stayed a few minutes, asked the patient how he was feeling, looked at the abdomen, and then went out. She had first attempted to call Dr. Page or Dr. Cunha and having asked if Dr. Daniels was in, was told he was in surgery and she expected him at any time. Dr. Gilbert testified that Dumelow told him plaintiff had been burned from hot packs; that she had notified Dr. Daniels who was in surgery and would be up as soon as he got out of surgery. She asked if Gilbert would take a look. He did so. He did not inquire if any other physician had been there earlier that day. The nurse told him that they had been putting hot packs on, had been having continuous hot packs. That fact and the definite burned area which he observed led him to conclude that something too hot had been there. He said he diagnosed it as a burn, but did not prescribe treatment for it because the nurse had told him Dr. Daniels was going to be out of surgery in about 15 or 20 minutes. (Inferentially, if Dr. Daniels had been unavailable, Gilbert might have prescribed without even inquiring as to the availability of Drs. Rogers, Cunha or Page, all of whom were assisting Dr. Daniels in the post-operative care of the patient.)

It is apparent that the trial judge deemed the conduct of Dr. Gilbert, his actual exercise of dominion and control, weightier and more persuasive than his mere words of disavowal of authority and responsibility. We would be improperly invading the function of the trier of the facts were we to undertake to substitute our appraisal for his of the credibility and weight of the evidence on that issue.[*]

We conclude that the evidence amply supports the finding

---

[*]This evidence concerning Dr. Gilbert, whether it came in before or after his several motions for nonsuit, is a complete answer to his claim that the trial court erroneously denied the motions for nonsuit which he made upon plaintiff's opening statement and again upon the close of plaintiff's case in chief. (See *Lowe* v. *San Francisco etc. Ry. Co.,* 154 Cal. 573, 575-576 [98 P. 678]; *Peters* v. *Southern Pac. Co.,* 160 Cal. 48, 52-53 [116 P. 400]; *Carter* v. *Canty,* 181 Cal. 749, 753 [186 P. 346]; *Housh* v. *Pacific States Life Ins. Co.,* 2 Cal.App.2d 14, 18 [37 P.2d 741]; *Reiman* v. *Moore,* 30 Cal.App.2d 306, 309 [86 P.2d 156]; *People* v. *Keith Ry. Equip. Co.,* 70 Cal.App.2d 339, 345-346 [161 P.2d 244].)

that each of the defendants, including Dr. Gilbert, had control of the body of the plaintiff and of the instrumentalities which may have injured him, during the three day period in question.

### The Showing Which Defendants Made In Explanation of the Accident

■ The finding that "defendants, and each of them," negligently cared for plaintiff and thereby caused the burn, implies a failure on their part to make a " 'showing either (1) of a satisfactory explanation of the accident, that is, an affirmative showing of a definite cause for the accident, in which cause no element of negligence on the part of the defendants inheres, or (2) of such care in all possible respects as necessarily to lead to the conclusion that the accident could not have happened from want of care, but must have been due to some unpreventable cause, although the exact cause is unknown. In the latter case, inasmuch as the process of reasoning is one of exclusion, the care shown must be satisfactory in the sense that it covers all causes which due care on the part of the defendant might have prevented.' " (*Dierman* v. *Providence Hospital*, 31 Cal.2d 290, 295 [188 P.2d 12].)

■ Two possible explanations as to the cause of the burn were offered. Neither of them was found satisfactory by the trial court.

Most of the defendants claim that the burn was caused by hot applications prepared and administered by special nurse Sheeran during the period 8:30 p. m. to 10 p. m. on the 7th of November. The evidence would support a finding either way.

In support of the negative finding made by the trial court is the testimony of Miss Sheeran that the temperature of the hot water bottle was 120 degrees and that she could not possibly have burned plaintiff. There is evidence that the standard heat for a hot water bottle is 120 degrees and that such temperature is well within the limits of safety.

Miss Sheeran testified that the hot water bottle she applied was less than half full and conformed in contour to plaintiff's abdomen. It was applied right on the center of the abdomen over the whole abdomen area. Plaintiff lay prone on his back. The hot water bottle measured 6 x 12 inches. Dr. Rogers testified that the burned area "redness, blisters and all" on November 10th or 11th covered an area of only one

inch by three inches in the lower right quadrant of the abdomen.

There was evidence that heat sufficient to cause a third degree burn would cause redness of the skin, if not immediately, then within two to four hours, certainly not much longer than three or four hours; and blisters in from a few minutes to 24 hours; and that the redness would persist until the burn turned into a scab or slough. Yet, there is evidence that none of these signs followed nurse Sheeran's application of the hot pack and hot water bottle. When she removed them (they had been in place from 8:30 p. m. to 10:05 p. m. on November 7th), she observed that plaintiff's skin was in good condition; there was no redness there. During the early part of nurse Salter's shift (11 p. m. November 7th to 7 a. m. November 8th) she observed that there was no redness, no blistering and no burned area. About 5 a. m. on November 8th she again examined the patient's abdomen and saw nothing abnormal. Nurse Dumelow gave the patient a bath between 9 and 10 a. m. on the 8th and testified there was no redness, blisters or burn at that time; nor at 2 p. m. of that day when she again had occasion to observe.

This seems a sufficient summary of some of the testimony which shows that the hot application in question was not proven as the cause of the burn by evidence that is "clear, positive, uncontradicted, and of such a nature that it can not rationally be disbelieved"; hence not "established as a matter of law." (*Blank* v. *Coffin,* 20 Cal.2d 457, 461 [126 P.2d 868]. See also *Leet* v. *Union Pac. R. R. Co.,* 25 Cal.2d 605, 621-622 [155 P.2d 42, 158 A.L.R. 1008].)

The other possible explanation offered by one of the defendants is that a Bovie cautery unit used during the operation may have caused the burn. From the standpoint of the time element it was possible because Dr. Daniels testified that the burn, when first seen by him on the morning of November 9th, could have been anywhere from several hours to several days old. This cautery unit involved the use of a metal plate 4 x 6 inches, grounded on the patient's skin. The plate could have been applied under the thigh or between the legs. In an operation of this type the patient is on his side throughout. The plate is usually, but not always, fastened securely with a few rolls of gauze. A Bovie cautery generates considerable heat and the plate can and has been known to cause burns. Dr. Daniels was of the opinion that

the Bovie cautery did not cause the burn because "where the heat is disseminated over that large an area [4″ v 6″] it's just not enough heat to burn." Dr. Rogers was of the opinion that the plate of the Bovie unit had not caused the burn because he examined plaintiff's abdomen November 7th, before ordering hot applications and found no burn. Obviously, it was not established as a matter of law that the Bovie cautery unit was instrumental in causing the burn.

There is a possibility that the burn may have been caused by the application of a hot pack with hot water bottle at any time during the three day period. The order for hot applications made by Dr. Rogers on November 7th was of a continuing nature and was not revoked by him during this three day period. Also, there was evidence tending to prove that hot packs had been continuously applied to the patient. Such evidence, of course, did not establish as a matter of law that any of those hot applications was the actual cause of the burn.

It is apparent that the trial court impliedly found that the defendants did not come forward with a satisfactory showing as to the cause of the burn. Nor can we, as a reviewing court, find that they did. Accordingly, the judgment must be affirmed.

### A Certain Opinion Filed by the Trial Judge Cannot Be Used to Impeach and Annul the Findings Which He Later Made and Filed

Most of the defendants rely heavily upon an opinion which the trial court filed some 25 days before findings were prepared, signed and filed. They would use it to "explain" the findings. That opinion,* they say, shows the court's reasoning process and demonstrates that the findings, as signed and

---

*In that opinion the trial court declared (a) that "the burn had its onset shortly after 8:40 p. m. on November 7th [1951], when a stupe with a hot water bottle imposed thereon was applied to plaintiff's abdomen by defendant Sheeran, a special nurse, who went off duty at 11 p. m. on that evening. There is evidence that the burn which started as above described was aggravated or intensified by the application of a hot water bottle to plaintiff's abdomen by defendant Salter, the special nurse who relieved Miss Sheeran at 11 p. m."; (b) that "the abdominal condition complained of could and should have been discovered by each of the defendants before it was, and that the reasonable care to which plaintiff was entitled required a prior discovery"; and (c) that "under the foregoing circumstances, the court is of the opinion that the defendants have failed to explain satisfactorily their failure to sooner discover plaintiff's burn, and that therefore they are all liable to him."

filed, are based upon implied findings (1) that the burn was caused by the negligence of.defendant Sheeran and intensified by the negligence of defendant Salter; (2) that each of the defendants was negligent in not sooner discovering the burn; and (3) therefore, all are liable for failing to explain satisfactorily their failure to sooner discover the burn. This, they say, is a *non sequitur* because the evidence shows that the delay, if any, in discovering the burn has no bearing upon its causation; wherefore, the evidence does not support the express finding that plaintiff sustained the burn "as a proximate result of the negligence and carelessness and lack of skill on the part of the defendants, and each of them." They then invoke *Ware* v. *Culp,* 24 Cal.App.2d 22 [74 P.2d 283], in which, contrary to the instant case, the trial court found the specific cause of the injury.

The fallacy of this argument is that it uses the opinion to impeach and annul the findings. It overlooks the possibility that further consideration during the weeks that intervened between the rendition of the opinion and the formulation and filing of the findings well may have convinced the judge he should revise his appraisal of the evidence. ■ "No antecedent expression of the judge, whether casual or cast in the form of an opinion, can in any way restrict his power to declare his final conclusion in the only manner authorized by law, to wit, by filing the 'decision' (findings of fact and conclusions of law) provided for by section 632 and 633 of the Code of Civil Procedure." (*Scholle* v. *Finnell,* 173 Cal. 372, 376 [159 P. 1179].)

In such a case the inquiry is not the speculative one of endeavoring to ascertain whether or not assertedly erroneous concepts putatively indicated by the opinion persisted in the mind of the judge and infected the findings which he later formulated and filed. Instead, the *"only question* [as in all other cases in which an appellant challenges the findings for insufficient support in the evidence] for us [as a reviewing court] *is whether these findings have sufficient legal support in the evidence and such inferences as may reasonably be drawn therefrom."* (*Goldner* v. *Spencer,* 163 Cal. 317, 320 [125 P. 347]; emphasis added.)

Thus, in *DeCou* v. *Howell,* 190 Cal. 741 [214 P. 444], the trial court had found that a certain deed lodged with a notary had been delivered, making it presently effective. The Supreme Court, convinced that there was sufficient evidence (though not entirely without conflict) to support that finding,

affirmed. Appellant urged that an opinion the trial judge had rendered indicated that the judge entertained a mistaken notion concerning the competency of certain evidence and thus had erroneously excluded that evidence from consideration when making his findings. The Supreme Court ruled that the opinion could not be considered "as indicating what operated upon its [the trial court's] mind in coming to a conclusion as to the ultimate facts of the case . . . The deliberations of the court are conclusively merged in the judgment. The findings of fact and conclusions of law constitute the decision which is the final, deliberate expression of the court." (P. 751.)

Similarly, in *Strudthoff* v. *Yates,* 28 Cal.2d 602 [170 P.2d 873], the appellants unsuccessfully urged consideration of an opinion which, they claimed, showed that the trial judge did not base certain findings as to value upon the evidence in the case. The reviewing court first examined the record and discovered that it contained evidence sufficient to support the questioned findings. It then rejected consideration of the opinion, saying: "The long established rule that the opinion of a trial judge cannot be substituted for nor used to modify the findings or judgment . . . is a complete answer to the plaintiffs' contention concerning the determination as to the value of the orange groves." (P. 615.)

In *Stone* v. *Los Angeles County Flood Control Dist.,* 81 Cal.App.2d 902 [185 P.2d 396], the trial judge had granted a new trial and the question was whether or not he had thereby abused his discretion. The appellants contended that an opinion the trial judge had written and filed contained inconsistent statement and showed that he had inaccurately analyzed the evidence and incorrectly applied the law. The reviewing court overruled this contention, saying: "We need not consider this contention. While an opinion of the judge of the trial court will aid the appellate court in ascertaining the process by which a judgment has been reached it will not be considered in determining whether or not the verdict of the jury or the findings of the court are supported by the evidence." (P. 907.)

These are not isolated decisions. They are illustrations of a long line of decisions that uniformly adhere to this rule.*

---

*The following are a few of this line of decisions:
*Estate of Felton,* 176 Cal. 663, 667 [169 P. 392]; *Huth* v. *Katz,* 30 Cal.2d 605, 609 [184 P.2d 521]; *Buckhantz* v. *R. G. Hamilton Co.,* 71 Cal.App.2d 777, 781 [163 P.2d 756]; *Redsted* v. *Weiss,* 73 Cal.App.2d

There are cases in which the trial judge's opinion has been properly used to explain the process of reasoning by which he arrived at his findings, but they are not this case. We refer particularly to *Coakley* v. *Ajuria,* 209 Cal. 745, [290 P. 33], *Union Sugar Co.* v. *Hollister Estate Co.,* 3 Cal.2d 740 [47 P.2d 273], and *Noble* v. *Kertz & Sons Feed etc. Co.,* 72 Cal.App.2d 153 [164 P.2d 257].

In the Coakley case, plaintiff had been nonsuited. The review of the evidence showed that there were sufficient facts to go to the trier of the facts unless it could be said, as a matter of law, that plaintiff's intoxicated condition *per se* barred recovery under every conceivable set of circumstances. An opinion which the judge had given showed his process of reasoning: contributory negligence of the plaintiff in being intoxicated, going upon the street, and falling down on the street and lying there in a drunken, helpless condition, acts which the writer of the opinion deemed negligence *per se.*

Concerning the opinion, the reviewing court said: "We think the learned trial judge took an erroneous view of the law applicable to the facts, as is made apparent from an oral opinion which he delivered directing the order of nonsuit. While the reasons of a trial court so given do not in a strict sense constitute a part of the record on appeal, yet where they furnish, as in this case, the basis of the court's action, and really constitute the only grounds upon which the judgment may be affirmed, it is proper to give them special consideration." (P. 749 of 209 Cal.) Indeed, the opinion served to confirm what the reviewing court had already determined from its review of the record; quite different from the use of such an opinion to impeach findings despite or dehors the record.

In the Union Sugar Company case, the findings specified the amount of damages which the respondent had sustained but did not show how that amount had been computed. The trial judge had previously filed a written opinion in which he expressed approval of a certain method of computation, using certain factors. By use of this method the reviewing court arrived at the identical total which appeared in the findings. It was certain therefrom that the judge did use the method set forth in his opinion. That method was erroneous for failure to deduct certain items of cost which were subject

889 [167 P.2d 735]; *Williams* v. *Kinsey,* 74 Cal.App.2d 583, 601 [169 P.2d 487]; *Larson* v. *Thoresen,* 116 Cal.App.2d 790, 797-798 [254 P.2d 656]; *Eley* v. *Curzon,* 121 Cal.App.2d 280, 285 [263 P.2d 86].

to mathematical calculation, demonstrating that the amount set forth in the findings was excessive in a certain amount. Accordingly, the reviewing court deducted that amount from the original judgment, and then affirmed. Of this the court said: ''The written opinion of the trial judge in the instant case clearly shows the process by which judgment was reached, or the basis on which the court computed the damages of the respondent under its counterclaim. It shows that the court simply took the number of tons of beets which the respondent lost by reason of appellant's improvident farming methods, and the price these beets would have brought had they been produced, and by multiplying this tonnage by the price arrived at the loss or damage sustained by respondent. By this process the court found the damages sustained by respondent to be the precise amount which in its findings of fact it found the respondent had been damaged by appellant's improper farming methods. The opinion of the trial court does not, therefore, impeach any of its findings of fact in the sense that any statement therein is in conflict with any fact found by the court. It simply explains the formal findings and shows the basis on which the court arrived at the amount of damages as fixed.'' (Pp. 750-751 of 3 Cal.2d.)

In the Noble case certain findings were ''directly contrary to the evidence introduced at the trial.'' (P. 155 of 72 Cal. App.2d.) The court commented: ''If we look only at the findings it necessarily follows that it must be held that the basic finding under discussion is contrary to the evidence.'' (P. 158.) It happened that the trial judge had filed an opinion from which it appeared that he had taken an unauthorized view of the premises and observed facts which (contrary to the duly admitted evidence in the case) supported the finding in question. That was truly an explanatory use of an opinion, explanatory of a finding which the reviewing court, independently of the opinion, determined was without support in the evidence; not, as most of the defendants urge in the instant case, the use of an opinion to impeach and annul findings which are amply supported by the evidence.

In *Silvers* v. *Wesson*, 122 Cal.App.2d 902 [266 P.2d 169], two opinions written by the trial judge proved very helpful to us in ascertaining from the record what the issues really were during the trial. Based upon that record we affirmed an order granting a new trial. That was a truly explanatory use of those opinions, not at all the use of an opinion to

infect with error an order for new trial which the record amply supported.

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.

Petitions for a rehearing were denied February 25, 1955, and the petitions of appellants La Societe Francaise de Bienfaisance Mutuelle, W. E. Cunha, Benjamin S. Page, Alfred C. Daniels, W. Lister Rogers, Florence Dumelo, William P. Gilbert and Honora Sheeran for a hearing by the Supreme Court were denied March 22, 1955. Edmonds, J., and Spence, J., were of the opinion that the petitions should be granted.