614 So.2d 760 (1993)
Patricia W. BECKHAM, et ux., Plaintiffs-Appellants,
v.
ST. PAUL FIRE AND MARINE, INSURANCE COMPANY, et al., Defendants-Appellees.
No. 24,193-CA.
Court of Appeal of Louisiana, Second Circuit.
February 24, 1993.
Rehearing Denied March 25, 1993.
*762 Nelson, Hammons & White by John L. Hammons, Shreveport, for plaintiffs-appellants.
Mayer, Smith & Roberts by Mark Goodwin, Shreveport, for defendants-appellees.
Before NORRIS, BROWN and STEWART, JJ.
BROWN, Judge.
During her after-surgery hospitalization, plaintiff, Patricia Beckham, sustained second and third degree burns. She and her husband, Larry, sued the surgeon, Dr. James R. Shamblin and his malpractice insurer, St. Paul Fire and Marine Insurance company. At the trial on the merits, the court found for defendants and plaintiffs appeal. For the reasons set forth below, we reverse.

FACTS
It is not disputed that Mrs. Beckham was injured through the medical negligence of the hospital nursing staff. The hospital settled with plaintiffs in a separate lawsuit. The issue presented in this appeal is whether any responsibility lies with the treating physician. The basic facts are clear.
In the fall of 1985, Mrs. Beckham consulted Dr. John Haynes concerning pain located along a hysterectomy scar. Dr. Haynes diagnosed an incisional hernia and recommended abdominal surgery. Mrs. Beckham was referred to Dr. Shamblin, a general surgeon. Because she also had flaccid skin, subcutaneous tissue and stretch marks caused by pregnancy, Mrs. Beckham decided to have an abdominoplasty ("tummy tuck") performed simultaneously with the repair of the hernia.
Dr. Shamblin scheduled surgery for November 1, 1985, at Riverside Community Hospital ("Riverside"). Hospital records indicate that surgery began at 12:10 p.m. on November 1 and ended at 1:50 p.m. that same day. The operative record states that the patient tolerated the procedure well and without complications.
Over the following two days, after-surgery care included injections of Demerol. At 10:00 a.m. on November 2, 1985, the day after surgery, Dr. Shamblin checked on Mrs. Beckham and ordered a "heating pad *763 to abdomen PRN" ["PRN" means "as needed"].
Although ordered at 10:00 a.m., the heating pad was not placed on Mrs. Beckham's abdomen until 2:30 p.m. The heating pad used was an electric pad with three temperature settings. The nurses' notes indicate that the patient was disoriented as to time and place when the pad was applied and that she tampered with both the pad and the abdominal binder which secured her dressings. At 7:30 a.m. on November 3, the nurses' notes reflect that Mrs. Beckham's abdomen was red over the entire area covered by the heating pad, but the heating pad was not removed, nor was any attempt made to contact Dr. Shamblin.
While making rounds at approximately noon on November 3, Dr. Shamblin discovered blistering on both sides of Mrs. Beckham's navel and discontinued application of the heating pad. At that time, the doctor ordered Neosporin, an antibiotic ointment, to be applied to the burned area. According to the nurses' notes, these blisters were still present at the time Mrs. Beckham was released from Riverside on November 7, 1985. On the day Mrs. Beckham was discharged, Dr. Shamblin removed every other staple which had been used in suturing the exterior of the horizontal incision (the abdominoplasty) and all staples from the vertical incision (the revision of old hysterectomy scar).
Following discharge and while being driven home from the hospital by her mother, Mrs. Beckham started having abdominal pain and noticed that the vertical incision was gapping (sloughing) open. Mrs. Beckham called Dr. Shamblin's office and was advised to stay in bed and to come in to see the doctor on Monday, November 11. All expert witnesses agreed that the excessive heat contributed to this incision pulling apart.
Mrs. Beckham saw Dr. Shamblin on November 11; he noted the burned areas and the sloughing (opening of the wound) around the vertical incision. Dr. Shamblin prescribed antibiotics and advised the application of ointment to the area. Dr. Shamblin saw Mrs. Beckham again on November 14 and for a final visit on November 21. The sloughing had progressively worsened on both of these visits. Dr. Shamblin advised Mrs. Beckham to clean the wounded areas with peroxide two to three times a day and to continue applying the antibiotic ointment.
Dissatisfied with Dr. Shamblin's treatment, Mrs. Beckham sought medical care from other doctors. Corrective surgery was done by Dr. Charles Itzig, a general surgeon; Dr. Itzig performed a surgical repair of the "pucker" in the old vertical incision and a revision of the scars from the burns and the scar caused by the slough or opening of the vertical incision on her abdominal wall.
Plaintiffs filed an action against American Medical International, Inc., owner of Riverside, on July 31, 1986. The claim against the hospital was compromised and settled on April 4, 1987. Thereafter, on July 22, 1987, Plaintiffs filed a complaint against Dr. Shamblin with the Commissioner of Insurance and the matter was referred to a medical review panel. Plaintiffs filed this lawsuit against Dr. Shamblin and his insurer in district court on February 29, 1989 (within the time allowed following the results from the medical review panel). Defendants filed an exception of prescription, which was referred to the trial on the merits. The exception claimed the complaint filed July 22, 1987, was not timely.
The trial court concluded that Dr. Shamblin did not commit medical malpractice. The court found that plaintiff's harm was entirely caused by the Riverside nursing staff. A formal judgment was signed on September 5, 1991, from which judgment plaintiffs have timely appealed.

STANDARD OF APPELLATE REVIEW
Appellate review extends to both law and facts, but an appellate court may not set aside a finding of fact in the absence of manifest error. La.Const. Art. 5, § 10(B); Smith v. American Indemnity Insurance Co., 598 So.2d 486 (La.App. 2d Cir.1992), writ denied, 600 So.2d 685 (La. 1992). The Louisiana Supreme Court set *764 forth a two part test used in appellate review of facts in Mart v. Hill, 505 So.2d 1120 (La.1987):
(1) the appellate court must find from the record that there is a reasonable factual basis for the finding of the trial court, and
(2) the appellate court must further determine that the record establishes that the finding is not clearly wrong.
Mart, 505 So.2d at 1127; McLain v. Glenwood Regional Medical Center, 602 So.2d 240 (La.App. 2d Cir.1992).
Appellate review of the trial court's findings in a medical malpractice action is limited. The standard of knowledge, skill and care for physicians is best determined from the testimony of other experts in the field. When the medical experts express different views, judgments and opinions on whether the standard was met in any given case, the reviewing court will give great deference to a trier of fact's evaluations. Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2d Cir.1991). The trier of fact's findings will not be disturbed in the absence of clear error, even if other conclusions from the same evidence are equally reasonable. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978); Gibson v. Bossier City General Hospital, supra; Reid v. North Caddo Memorial Hospital, 528 So.2d 653 (La.App. 2d Cir.1988).

BURDEN OF PROOF AND PRINCIPLES OF LAW
LSA-R.S. 9:2794(A) provides:
In a medical malpractice action against a physician or surgeon, the plaintiff has the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then plaintiff has the burden of proving the degree of care ordinarily practiced by physicians ... within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
The plaintiff is not required to prove that the defendant's conduct was the only cause of the harm, nor must the plaintiff negate all other possibilities; the plaintiff must only show by a preponderance of the evidence that the injury suffered was caused in part by the defendant's substandard conduct. Straley v. Calongne Drayage & Storage, Inc., 346 So.2d 171 (La.1977). The plaintiff is not required to prove "beyond a reasonable medical certainty" that medical negligence occurred, but must only prove the three elements required by LSA-R.S. 9:2794(A) by a preponderance of the evidence.
The doctor's professional judgment and conduct are evaluated in terms of reasonableness under the then existing circumstances, not in terms of result or in light of subsequent events. A physician is not required to exercise the highest degree of care possible; his duty is to exercise the degree of skill ordinarily employed by his professional peers under similar circumstances. Gibson v. Bossier City General Hospital, supra.
The standard of knowledge, skill and care for physicians and surgeons is best determined from the testimony of other experts in the field. Gibson, supra.

DID THE TRIAL COURT ERR IN CONCLUDING THAT DR. SHAMBLIN DID NOT DEVIATE FROM APPLICABLE MEDICAL STANDARDS?
All experts testifying in this case, including Dr. Shamblin, agreed that Mrs. Beckham was injured because of medical *765 negligence. This malpractice resulted from the failure to monitor the application of heat during post-surgery care.[1] Dr. Shamblin claims that all blame rests with the nursing staff. Indeed, the issue presented is whether any responsibility lies with Dr. Shamblin as the treating physician.
Medical care of patients in a hospital emanates from the joint efforts and teamwork of the hospital's nursing staff and physicians. The physician has control over the patient and the methods used to speed recovery. Because of this control, it is the physician's responsibility to direct the nursing staff. The nursing staff and physician must work in concert and be knowledgeable of the facilities, equipment and services that may be utilized in the treatment and care of the patient. This obligation includes a mutual understanding of the nomenclature used in the particular hospital; this awareness is critical and serves to minimize the chances of confusion or misunderstanding between the physician and the nursing staff regarding the care and treatment of the patient.
Dr. Shamblin issued a verbal order to the nursing staff regarding the post-operative care of Mrs. Beckham. The order was "heating pad to abdomen PRN" ["PRN" meaning "as needed"]. Although not specified in the order, Dr. Shamblin testified that the purpose of the pad was for patient comfort and to relieve gas pains. The electric heating pad that was applied to and left on Mrs. Beckham's abdomen in excess of twenty-two hours had three heat control settings. Dr. Shamblin testified that this type of pad was not the kind he wanted applied to Mrs. Beckham's abdomen and should not have been used. Dr. Shamblin, however, was unaware that Riverside had three types of pads in stock: aqua K-pads, hydroculator pads and the three setting electric heating pads. Dr. Shamblin admitted that he did not know or make any attempt to determine what types of heating pads were available at Riverside. The other experts testifying for both plaintiffs and defendants agreed that the nurses correctly interpreted Dr. Shamblin's order to mean the use of the type of electric pad applied in this case.
The heating pad used in this case, its cover and the box it came in displayed these prominent warnings:
(1) Caution: do not use on an infant, invalid, or a sleeping or unconscious person unless carefully attended. Check skin under pad frequently to avoid burning. Burns may occur regardless of control setting.
(2) Never use pad in direct contact with skin. Use cloth cover or place towel between pad and skin surfaces.
(3) Do not use over areas of insensitive skin.
Dr. George McCormick, an expert for plaintiffs and a forensic pathologist, set forth four factors that substantially increased Mrs. Beckham's risk of burn from the application of heat. All the experts agreed that these factors should have been considered in determining how the heat was to be monitored. The factors were:
(1) The skin in the area of the surgical incisions was less sensitive to pain;
(2) Dr. Shamblin intended that the pad be applied overnight, when Mrs. Beckham would be sleeping and less aware of pain;
(3) Dr. Shamblin ordered injections of Demerol, a pain-killing narcotic, which greatly decreased Mrs. Beckham's perception of and responsiveness to pain; and
(4) Mrs. Beckham was disoriented as to time and place.
In addition, all experts recognized that Dr. Shamblin used stainless steel staples to close the incisions. These staples are conductors of heat which could have contributed to the severity of the burns.
*766 Dr. Shamblin testified that the area of the incision had diminished sensation. All of the experts, including Dr. Shamblin, stated that any time heat is applied to a patient in a hospital setting, there is a risk of burn, which risk is greatly increased when heat is applied for twenty-one or more hours to an area of desensitized skin. Dr. McCormick and Dr. O'Neal testified that surgery reduces the normal sensitivity of the skin in the area of the incision because the nerves are cut and the swelling causes the nerves to constrict. According to Dr. McCormick, the warning against applying the pad to areas of "insensitive skin" meant skin with "less than optimum sensitivity" and that the site of Mrs. Beckham's incision was such skin.
Dr. Shamblin stated that Mrs. Beckham was asleep while the heating pad remained on her abdomen. The risk of burn is increased when the heating pad is applied to a sleeping patient. According to Dr. McCormick, sleeping causes reduced awareness of and response to pain.
Between the time the heating pad was applied and the time it was removed, Mrs. Beckham received five shots of Demerol; the narcotic was prescribed to minimize Mrs. Beckham's awareness of and response to pain. Dr. McCormick testified that injections of Demerol have the potential to increase the risk of burn to the patient because the medication decreases awareness to pain and causes drowsiness and relaxation. Nurse Tyler testified that a sedated patient with a heating pad on her abdomen needs close supervision.
The nurses' records reflect that Mrs. Beckham was disoriented when the pad was ordered (10:00 a.m. on November 2) and when the heating pad was removed (noon on November 3). Mrs. Beckham testified that she doesn't remember the heating pad being on her abdomen. Dr. McCormick and Dr. O'Neal testified that a medically disoriented person will have a reduced or confused potential response to painful stimuli and that Mrs. Beckham's disorientation was probably caused by the anesthesia wearing off and the series of Demerol injections she was receiving. Dr. Valiulis, a plastic surgeon and defense expert, testified that a disoriented patient needs close supervision and that if a patient has tampered with the temperature setting on the heating pad, the doctor should be notified or the pad removed.
Although he had stopped using heat in his post-surgery practice, defendant's expert, Dr. John Valiulis, a plastic and reconstructive surgeon, stated that the application of heat with this type of pad was acceptable if correctly monitored by the nursing staff. Dr. Valiulis also testified that when he had used heat in the past it was to increase circulation which improved healing and not for gas pain. Dr. Valiulis, however, agreed that the purpose for ordering the heat (to improve circulation or relieve gas pains), the type of instrument to be used (K-pad. etc.) and the patient's awareness would determine the duration and supervision of the treatment. In this case, Dr. Valiulis opined that Mrs. Beckham was harmed by the nurses' failure to properly monitor the heat treatment.
Dr. McCormick testified that a physician giving orders should do so in a manner that is easily understood and that the orders should be specific in the method, frequency and purpose regarding treatment. Dr. McCormick found Dr. Shamblin's order regarding the heating pad to be confusing.
Dr. Barron O'Neal, a plastic and reconstructive surgeon, and Dr. Charles Itzig, a general surgeon, testified for plaintiffs that physicians on the active staff of a hospital have an obligation to familiarize themselves with the hospital facilities, equipment and nursing staff. Drs. O'Neal and Itzig also stated that a doctor has the duty to give orders in a concise and understandable fashion to avoid confusion and misunderstanding. Dr. Itzig testified that physicians should learn and utilize the terminology of a particular hospital or familiarize the staff with his own nomenclature.
Dr. Shamblin testified that he gave no instructions to the nurses to check on the heating pad, though he expected them to do so when they checked on the incision site. However, in an earlier deposition, Dr. Shamblin stated that he did not expect the *767 nurses to check on the heating pad while Mrs. Beckham was sleeping. Also, he testified that had he known the type of heating pad that was used, he would have had it removed or if it was to have been left on Mrs. Beckham for any length of time, he would have expected the nurses to regularly check the patient.
Defendants' witness, Katherine Tyler, R.N., testified that Dr. Shamblin's order did not set forth why the heating pad was to be applied. She testified that the purpose for applying heat would dictate the length and frequency of the use of the pad. According to Ms. Tyler, had she been the nurse taking the order (she was a surgical nurse, not a floor nurse), she would have asked what type of heating pad was intended and the purpose the heat was to serve.
All the experts, except Dr. Shamblin, agreed that the nurses correctly interpreted that the order called for this type of electric heating pad. The fact that Riverside had three types of pads in stock, along with Dr. Shamblin's testimony that the term "heating pad" meant to him either a K-pad or a single setting electric pad, caused the order as given to be ambiguous and inadequate. Furthermore, the order did not specify the purpose, duration or list instructions for the pad's monitoring or supervision by the nursing staff.
Dr. Shamblin asserts that the only negligence involved was that of the nursing staff by using this type of heating pad and then failing to monitor its use. We disagree. Dr. Shamblin did exercise control over Mrs. Beckham's post-operative care and was responsible for her treatment. It was Dr. Shamblin, not the nursing staff, who ordered the application of heat. Dr. Shamblin did not specify why the pad was ordered, what type of pad was to be used or give instructions regarding the monitoring or supervision of its use. Dr. Shamblin made no effort to familiarize himself with the types of pads available at Riverside and thus ordered through admitted error the application of a pad which displayed several warnings against its use on patients such as Mrs. Beckham (i.e. patients who have insensitive skin, are sleeping, are on pain medication and have periods of disorientation).
All of the experts testified that Dr. Shamblin's decision to apply heat to the surgical site approximately twenty-four hours post-operative was not a deviation from the applicable standard of care. However, we note with interest that none of these experts would have used heat and believed if used, the pad's purpose would be to improve circulation to enhance healing. However, the decision to apply heat entails more, such as method, purpose and duration, all of which should be evaluated in light of the particular patient's condition. Riverside had aqua K-pads and hydroculator pads, both of which are safer than electric heating pads in post-operative use. Although desiring a K-pad, Dr. Shamblin's order did not specify this safer alternative. In fact, Dr. Shamblin did not know or check to see what type of pads were available at Riverside. Because all experts, except Dr. Shamblin, agreed that an appropriate interpretation of the order was the use of this three-setting heating pad, we conclude that the order authorizing the use of this particular type of heating pad without additional instructions when the patient was heavily sedated and unlikely to sense injury was medical negligence. Thus, Dr. Shamblin's negligence along with the negligence of the nursing staff caused Mrs. Beckham's injuries. See Oldis v. La Societe Francaise De Bienfaisance, 130 Cal. App.2d 461, 279 P.2d 184 (Cal.App. 1st Dist.1955).

HAS THE PLAINTIFFS' CLAIM PRESCRIBED?
Defendants filed an exception of prescription before the matter went to trial. A ruling on the exception was referred to the merits. Based on its finding that Dr. Shamblin was not liable to plaintiffs in medical malpractice, the issue of prescription was not addressed by the trial court.
Dr. Shamblin ordered application of the heating pad on November 2, 1985; the heating pad was applied on that date and was subsequently removed by Dr. Shamblin the following day. Dr. Shamblin was *768 involved with Mrs. Beckham's treatment for the last time on November 21, 1985. The Beckhams filed suit against American Medical International, Inc. ("AMI"), owner of Riverside, on July 7, 1986, within one year of the alleged act of negligence. Plaintiffs entered into a settlement with AMI and by joint motion the suit was voluntarily dismissed with prejudice on April 28, 1987. Both the joint motion and the order of dismissal reserved to plaintiffs all claims they may have against any other persons. Plaintiffs filed their complaint against Dr. Shamblin with the Commissioner of Insurance on July 22, 1987, and this suit was filed thereafter.
According to the defendants, the claim against Dr. Shamblin has prescribed because plaintiffs did not file suit against him within one year from the date of discovery of the alleged act of malpractice. This argument is only valid if the filing of the lawsuit against AMI did not interrupt the running of prescription. Defendants rely on LSA-C.C. Art. 3463, which provides that the interruption of prescription because of the filing of suit in a competent court and in the proper venue is considered never to have occurred if the plaintiff abandons, voluntarily dismisses or fails to prosecute the case at trial. Defendants contend that because the suit against AMI was dismissed with prejudice, the interruption of prescription caused by the suit against AMI is considered as if it never happened.
The interruption of prescription against one solidary obligor is effective against all solidary obligors and their heirs. LSA-C.C. Art. 1799. LSA-C.C. Art. 3462 provides that prescription is interrupted when the obligee commences action against the obligor in a court of competent jurisdiction. It is the filing of suit that interrupts prescription. Prescription begins to run anew from the date of the dismissal of the lawsuit which interrupted prescription. Garrity v. Cazayoux, 430 So.2d 1138 (La. App. 1st Cir.1983).
In Hebert v. Doctors Memorial Hospital, 486 So.2d 717 (La.1984), the district court dismissed the plaintiff's medical malpractice action on an exception of prescription. The First Circuit affirmed the dismissal. The Louisiana Supreme Court reversed, citing LSA-C.C. Art. 3463, holding that a suit is pending until a final judgment dismissing it has been filed. Thus, the plaintiff's suit against the hospital was pending until its dismissal and plaintiff's suit against the physician allegedly obligated solidarily with the hospital which was filed three months before the suit against the hospital was dismissed, was timely.
In Whitnell v. Menville, 540 So.2d 304 (La.1989), the supreme court reaffirmed that the prescriptive periods for medical malpractice actions are subject to interruption in the same way as are other solidary obligations. In Whitnell, the plaintiffs initially sued Dr. Silverman. That suit was dismissed on an exception of prematurity. Plaintiffs then submitted their claims against Dr. Silverman to a medical review panel. Plaintiffs then instituted a suit against Dr. Silverman, Dr. Swartz and Dr. Menville. Dr. Menville filed an exception of prescription. Plaintiffs argued that their initial action against Dr. Silverman interrupted prescription against Dr. Menville because the doctors were joint tortfeasors. The supreme court affirmed the trial court's ruling that plaintiffs' claims against Dr. Manville were prescribed because their claims were prescribed before the initial suit against Dr. Silverman. The court held that the filing of suit does serve to interrupt prescription as to all solidary obligors as long as the suit is pending. However, if prescription has already run against one of the solidary obligors before the action is filed against the other, it cannot be interrupted. See also White v. West Carroll Hospital, Inc., 598 So.2d 1134 (La.App. 2d Cir.1992).
The plaintiffs have alleged that Riverside and Dr. Shamblin are solidary obligors. According to Dr. Shamblin, Mrs. Beckham's injuries were caused by the medical negligence of the nursing staff at Riverside. Dr. McCormick testified that the nurses' failure to check the heating pad was a deviation of good nursing care and that if the nursing staff properly monitors *769 the application of heat, the patient is not exposed to the risk of burn. Dr. McCormick, Dr. O'Neal and Dr. Valiulis stated that the nurse who noticed the reddened condition of Mrs. Beckham's abdomen at 7:30 a.m. on November 3 should have either contacted Dr. Shamblin or discontinued the heating pad on her own. On cross-examination, Dr. McCormick admitted that physicians have the right to rely on the nursing staff to use reasonable nursing judgment in executing his orders. Katherine Tyler, a surgical nurse, testified that she would never leave a heating pad on a patient continuously for a twenty-four hour period and that if she were the nurse who initially applied the heating pad, she would have read and followed the warnings. Dr. O'Neal and Dr. Valiulis testified that the nursing staff has an independent duty to monitor and supervise the application of heat post-operatively and that if the nurses had properly monitored the heating pad's application, Mrs. Beckham would not have sustained her injuries.
The evidence clearly establishes the liability of Riverside for the injuries suffered by Mrs. Beckham. The evidence also establishes that Dr. Shamblin was at fault for Mrs. Beckham's injuries.
In Roger v. Estate of Moulton, 513 So.2d 1126 (La.1987), the plaintiff, Donald Roger ("Roger"), was injured in an automobile accident and filed suit against the alleged tortfeasors and their insurers. Prior to trial, Roger settled with the defendants and dismissed the suit with prejudice, reserving his rights against Liberty Mutual Insurance Company ("Liberty Mutual"). After dismissal, Roger filed a separate lawsuit against Liberty Mutual. Liberty Mutual argued that the interruption of prescription that occurred pursuant to LSA-C.C. Art. 3463 was nullified when Roger settled and voluntarily dismissed his claims against all defendants who were named in his original action. Citing Hebert v. Cournoyer Oldsmobile-Cadillac GMC, Inc., 419 So.2d 878 (La.1982), the supreme court noted that to maintain Liberty Mutual's plea of prescription, Roger must have voluntarily dismissed his claims prior to the defendants in that action making a general appearance. Thus, because the original defendants in that first lawsuit made appearances before its dismissal, the last sentence of LSA-C.C. Art. 3463 was inapplicable and Roger's original suit against those tortfeasors served to interrupt prescription against Liberty, who was later sued. The dismissal did not nullify the interruption of prescription. See also Provident Life and Accident Insurance Company, 582 So.2d 250 (La.App. 1st Cir.1991).
Thus, prescription against Dr. Shamblin, which had not run when suit was filed against AMI, was interrupted by plaintiffs' suit against AMI. Prescription began to run anew when the suit against AMI was dismissed. Plaintiffs' suit against Dr. Shamblin was filed within a year from the dismissal of the first suit. Therefore, plaintiffs' suit has not prescribed.

DAMAGES
The courts of appeal have a constitutional duty to review the law and facts. La. Const. Art. 5, § 10(B); LSA-C.C. Art. 1999; Ard v. Samedan Oil Corporation, 483 So.2d 925 (La.1986). Once it is determined that the trier of fact is clearly wrong, the appellate court is empowered by LSA-C.C.P. Art. 2164 to render any judgment which is just, legal and proper. Watson v. State Farm, 469 So.2d 967 (La. 1985); Simpson v. Caddo Parish School Board, 540 So.2d 997 (La.App. 2d Cir.1989).
Courts of appeal may award damages when the trial court initially rejects plaintiff's demands and where the record contains sufficient proof of damages. Daugherty v. Casualty Reciprocal Exchange Insurance Company, 522 So.2d 1323 (La.App. 2d Cir.1988); Fussell v. Louisiana Business College of Monroe, 519 So.2d 384 (La.App. 2d Cir.1988); Jones v. P.K. Smith Chevrolet-Olds, Inc., 444 So.2d 1372 (La.App. 2d Cir.1984). In making an initial award of damages at the appellate level, we are not limited to an award of either the lowest or highest amount we would affirm. Instead, we set the award in an amount which is just compensation for the damages revealed by the *770 record. Wall v. American Employers Insurance Co., 386 So.2d 79 (La.1980); Simmons v. City of Monroe, 588 So.2d 1357 (La.App. 2d Cir.1991); Lee v. Great Southwest Fire Insurance Co., 493 So.2d 789 (La.App. 2d Cir.1986).

PATRICIA BECKHAM'S DAMAGES
Mrs. Beckham sustained severe second and third degree burns on her abdomen. She also had sloughing around the area of the vertical incision. This "sloughing" involved a large area of devitalized tissue around an inverted "T" where the two incisions came together. According to Dr. Shamblin, the burns and sloughing led to a prolonged recovery period. Mrs. Beckham had to have corrective surgery to repair the slough and to minimize the scars from the burn. Even after this second surgery, Mrs. Beckham has permanently scarred areas on her abdomen.
Mrs. Beckham suffered extreme pain and discomfort during the three and one-half months between the original and corrective surgeries. She was bedridden for the first month and was limited in her activities for the other two and one-half months. Mrs. Beckham testified that standing upright to walk was impossible because of the gapping and pulling of the vertical incision and that she had to walk stooped over, which caused her back and legs to hurt. The cleaning out of the gapping and sloughing areas with peroxide was very painful to Mrs. Beckham. Mrs. Beckham testified that she was very depressed, had nightmares and cried constantly. There was a serious strain on her relationships with her husband and her teen-aged son. During the period of time she was bedridden, her husband, who continued to work full-time, and her son took care of her and performed her normal household duties.
Dr. Itzig, the physician involved in Mrs. Beckham's subsequent treatment, prescribed anti-depressants and advised surgical repair of the incision and slough. However, Mrs. Beckham feared further surgery because of her experience and waited a few weeks.
Mrs. Beckham's purpose in having the abdominoplasty and scar revision was cosmetic; she wanted to get rid of the flabby skin in her abdominal area caused by pregnancy and to minimize the scarring. Mrs. Beckham was a small person and she wanted her stomach to be the same size as the rest of her body. She was uncomfortable in her clothing because what would fit her everywhere else would not fit in the stomach. According to Mrs. Beckham, it was very difficult for her to watch her stomach's condition progressively getting worse when she was expecting just the opposite from the surgery.

GENERAL DAMAGES
General damages involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment which cannot be measured definitively in terms of money. Boswell v. Roy O. Martin Lumber Company, Inc., 363 So.2d 506 (La.1978); Anderson v. Bennett Wood Fabricators, 571 So.2d 780 (La. App.2d Cir.1990); writ denied, 573 So.2d 1135 (La.1991); Hunt v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, 522 So.2d 1144 (La.App. 2d Cir.1988). There is no mechanical rule for determining general damages; the facts and circumstances of each case control. Estate of Thomas v. State, D.O.T.D., 604 So.2d 617 (La.App. 2d Cir.1992); Tide Craft, Inc. v. Red Ball Oxygen Company, Inc., 514 So.2d 664 (La. App. 2d Cir.1987), writs denied, 516 So.2d 135, 136 (La.1987).
Mrs. Beckham was not employed at the time she was injured, so she has no lost wages or loss of earning capacity. However, she suffered severe pain and discomfort, mental anguish and depression, endured a disruption to her normal family life and was forced to undergo an additional surgical procedure to minimize the permanent damage and scarring. We feel that an award of $100,000 will adequately compensate Mrs. Beckham for her injuries.

*771 SPECIAL DAMAGES
Medical expenses, past and future, which are incurred by an injured plaintiff, are recoverable as an element of damages. Thames v. Zerangue, 411 So.2d 17 (La. 1982); Nichols v. Stone Container Corp., 552 So.2d 688 (La.App.2d Cir.1989), writ denied, 556 So.2d 1262 (La.1990). The record contains copies of all of the medical expenses incurred by Mrs. Beckham, including those expenses related to the first surgery, for a total of $9,221.17. These medical expenses are recoverable in full.

LARRY BECKHAM'S DAMAGES LOSS OF CONSORTIUM
Entitlement to damages for loss of consortium is afforded by statute. LSA-C.C. Art. 2315 provides in part that damages may include loss of consortium, service and society, and shall be recoverable by the same respective categories of persons who would have had a cause of action for wrongful death of an injured person. In Finley v. Bass, 478 So.2d 608 (La.App. 2d Cir.1985), loss of consortium was broken down into seven types of loss: loss of love and affection; loss of society and companionship; impairment of sexual relations; loss of performance of material services; loss of financial support; loss of aid and assistance; and loss of fidelity. Clark v. Ark-La-Tex Auction, Inc., 593 So.2d 870 (La.App. 2d Cir.1992); Warner v. Great Atlantic and Pacific Tea Co., Inc., 583 So.2d 61 (La.App. 2d Cir.1991). As the First Circuit observed in Sexton v. Louisiana Vacuum Services, Inc., 506 So.2d 780 (La.App. 1st Cir.1987), to be compensable, it is not necessary for a claim for consortium to include damages from each type set forth in Finley, supra.
In American Motorist Insurance Company v. American Rent-All, Inc., 566 So.2d 121 (La.App. 5th Cir.1990), affirmed in part, reversed in part, 579 So.2d 429 (La.1991), the trial court originally awarded $55,000 to the husband for loss of consortium. This award was reduced by the court of appeals to $10,000 and raised by the supreme court to $25,000. The wife's injuries required her husband to take over looking after their child and performing the household duties. The couple's marital life suffered because of the wife's injury and subsequent pain and depression and they were unable to enjoy recreational and social activities together.
The trial court awarded $25,000 for loss of consortium to the husband of a woman injured when she tripped over a one inch elevation at the entrance of a restaurant in Sistler v. Liberty Mutual Insurance Co., 558 So.2d 1106 (La.1990). This award was reinstated by the supreme court after the appellate court reversed and dismissed plaintiff's petition. His wife's fall forced Mr. Sistler to change his life style. There was also testimony that the accident had an impact on the couple's personal relationship.
Recently in Bolton v. Nagalla, 609 So.2d 1134 (La.App. 2d Cir.1992), we affirmed a consortium award of $50,000 to a wife in a medical malpractice lawsuit. The injury placed a great strain on the couple's relationship and caused a decline in their social activities. The wife suffered depression as a result of the change in her life and additional stress from having to handle family matters once handled by her husband.
The plaintiff in Schwamb v. Delta Airlines, 516 So.2d 452 (La.App. 1st Cir.1987), was injured by a briefcase falling out of an overhead bin onto his head. The appellate court affirmed the trial court's award of $35,000 to the wife, based on evidence that the couple's love life was "nil" and her husband had become grouchy and unable or unwilling to perform tasks around the house.
Mrs. Beckham was confined to her bed for one month following her injury and was further limited in her activities for approximately two and a half months after that. Mrs. Beckham testified that her husband had to help her clean out her wounds, a task which made him nauseated and sick because it looked to him like she had been shot in the stomach at close range with a shotgun. While she remained incapacitated, Mr. Beckham was forced to take over the household duties in addition to his full-time job. Mrs. Beckham was very depressed, *772 had nightmares and cried constantly. According to Mr. Beckham, his wife was very emotional and had no patience with him. The Beckhams' marital relationship deteriorated. It was not until the corrective surgery that the couple saw improvement. Mr. Beckham is entitled to damages in the amount of $35,000 for loss of consortium.

EFFECT OF SETTLEMENT BETWEEN PLAINTIFFS AND RIVERSIDE (AMI)
As stated previously, Dr. Shamblin and Riverside (AMI), as joint tortfeasors, are solidarily obligated for the injuries sustained by the plaintiffs. See Billeaudeau v. Lemoine, 386 So.2d 1359 (La.1980); Carroll v. Kilbourne, 525 So.2d 284 (La.App. 1st Cir.1988). LSA-C.C. Art. 1803 provides that remission of debt by the obligee in favor of one obligor, or a transaction or compromise between the obligee and one obligor, benefits the other solidary obligors in the amount of the portion of that obligor. Revision Comment (b) provides that in case of transaction, compromise or settlement between the obligee and one of the solidary obligors, the liability of the other solidary obligors is reduced in the amount of the portion of that obligor.
The plaintiffs' release of Riverside (AMI) thus reduces the amount recoverable by the plaintiffs from Dr. Shamblin in the amount of the percentage of fault attributable to Riverside (AMI), which percentage we find to be 60 percent.

CONCLUSION
For the foregoing reasons, it is ordered, adjudged and decreed that the judgment of the trial court is reversed and set aside, and that there be judgment in favor of the plaintiffs, Patricia and Larry Beckham, and against the defendants, Dr. James Shamblin and St. Paul Fire and Marine, in the amount of $57,688.47 (total award of $144,221.17 times 40 percent, the percent attributable to Dr. Shamblin), together with legal interest from the date of judicial demand, until paid. All costs, here and below, are taxed to the defendants.
STEWART, J., concurs in the result.

APPLICATION FOR REHEARING
Before NORRIS, HIGHTOWER, VICTORY, BROWN and STEWART, JJ.
Rehearing denied.
NOTES
[1] Dr. Shamblin testified that the medical negligence was "the use of that particular heating pad"; however, the other experts agreed that the negligence consisted of the lack of proper supervision in the use of the pad. It is noteworthy that none of the experts would have used any heat on Mrs. Beckham, but would not say that the use of heat was below applicable medical standards.